[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14373

_____

D.C. Docket No. 2:05-cr-00119-MEF-CSC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DON EUGENE SIEGELMAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(May 20, 2015)

Before JILL PRYOR, FAY, and EBEL,[*] Circuit Judges.

EBEL, Circuit Judge:

Defendant-Appellant Don Eugene Siegelman appeals from the district court's order denying his motion for a new trial and the court's amended final judgment sentencing him to seventy-eight months in prison. Exercising our jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we hold that the district court did not abuse its discretion in denying Siegelman's motion for a new trial and did not err in calculating Siegelman's sentence under the Guidelines. Accordingly, we affirm.

## BACKGROUND[1]

From 1995 to 2003, Siegelman served the State of Alabama first as Lieutenant Governor and then as Governor. During his time in office, Siegelman engaged in a range of conduct that eventually became the focal point of a state-federal criminal investigation. See United States v. Siegelman, 640 F.3d 1159, 1164, 1168 (11th Cir. 2011) [hereinafter Siegelman II]. That investigation targeted Siegelman and several other individuals, including: Richard Scrushy, the Chief Executive Officer of a major hospital corporation with operations throughout

---

[*] The Honorable David M. Ebel, Senior United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, sitting by designation.

[1] Because this case has complicated facts and a complex procedural history, we narrowly tailor our background section to track the issues presented in this appeal.

2

Alabama; Nicholas Bailey, Siegelman's close associate and former confidential assistant; and Lanny Young, Siegelman's long-time business associate. See id. at 1164, 1166, 1168.

As a result of the investigation, Plaintiff-Appellee United States (the "Government") charged Siegelman and Scrushy with multiple counts of federal funds bribery and honest services mail fraud, and one count of conspiracy to commit honest services mail fraud. These charges were based on an arrangement (the "Siegelman-Scrushy Exchange") wherein Siegelman appointed Scrushy to the Certificate of Need ("CON") Board, a state board that determined the number of healthcare facilities in Alabama, in exchange for Scrushy's $500,000 donation to the Alabama Education Lottery Foundation (the "Foundation"), a foundation Siegelman established to raise money for a ballot initiative that would help fund universal education in Alabama through the creation of a state lottery. Id. at 1164–67. Although Siegelman eventually reported Scrushy's donation, Bailey helped Siegelman conceal the donation for approximately two years. Id. at 1167–68.

The Government also charged Siegelman, but not Scrushy, with, *inter alia*, honest services wire fraud, additional counts of honest services mail fraud, and obstruction of justice. The obstruction of justice charges were based on a series of sham transactions (the "Siegelman-Young-Bailey Sham Transactions") carried out after the investigation into Siegelman had commenced, wherein Siegelman,

3

Young, and Bailey attempted to conceal a $9200 payment that Young had made to Siegelman. Id. at 1164, 1168, 1177. The honest services wire fraud charges, as well as the additional counts of honest services mail fraud, were based on conduct arising from a general "pay-for-play" agreement (the "Siegelman-Young Agreement") wherein Young gave Siegelman money and other things of value in return for official action that benefited Young's business interests.[2]

In 2006, a jury found Siegelman and Scrushy—who were tried together[3]— each guilty of one count of federal funds bribery, four counts of honest services mail fraud, and one count of conspiracy to commit honest services mail fraud, all pertaining to the Siegelman-Scrushy Exchange. Id. at 1164, 1169, 1172. The jury also found Siegelman guilty of one count of obstruction of justice related to the Siegelman-Young-Bailey Sham Transactions. Because the jury acquitted Siegelman of all other charges, he was not convicted of any counts that were based on the Siegelman-Young Agreement. Id. at 1169. The district court thereafter sentenced Siegelman to eighty-eight-months' imprisonment and Scrushy to eighty-two-months' imprisonment.

---

[2] Based on all of the conduct that is relevant on appeal (i.e., the Siegelman-Scrushy Exchange, the Siegelman-Young-Bailey Sham Transactions, and the Siegelman-Young Agreement), as well as some conduct not relevant on appeal, the Government also charged Siegelman with racketeering conspiracy and racketeering.

[3] Siegelman and Scrushy were also tried with Paul Michael Hamrick and Gary Mack Roberts. Hamrick and Roberts were found not guilty.

On appeal, we reversed two of Siegelman's fraud convictions related to the Siegelman-Scrushy Exchange, but affirmed all of Scrushy's convictions.  See United States v. Siegelman, 561 F.3d 1215, 1232, 1245 (11th Cir. 2009).  The Supreme Court granted certiorari, vacated the judgment, and remanded the case back to this Court for further consideration in light of Skilling v. United States, 561 U.S. 358, 130 S. Ct. 2896 (2010).  See Siegelman v. United States, 561 F.3d 1215 (11th Cir. 2009), 130 S. Ct. 3542 (2010); Scrushy v. United States, 561 U.S. 1040, 130 S. Ct. 3541 (2010).  On remand from the Supreme Court, we reversed two of Siegelman's fraud convictions (again), as well as two of Scrushy's fraud convictions that were related to the Siegelman-Scrushy Exchange, and remanded the case so both defendants could be resentenced.  See Siegelman II, 640 F.3d at 1174–77, 1190.

Importantly, during the pendency of their joint appeal, Siegelman and Scrushy each filed a motion for a new trial under Fed. R. Crim. P. 33(b)(1) and a related motion for additional discovery.  These separate—but nearly identical—motions were based, in relevant part, on allegations that U.S. Attorney Leura Canary continued to participate in the defendants' prosecution after voluntarily disqualifying herself because of a possible conflict of interest.  According to Siegelman and Scrushy, they were each entitled to a new trial under Rule 33(b)(1)

5

because evidence of Canary's purported failure fully to honor her disqualification surfaced after they were originally sentenced.

On remand for resentencing, Scrushy's motions were considered first.  After a magistrate judge denied Scrushy's motion for additional discovery, the district court denied his motion for a new trial and ultimately issued an amended final judgment resentencing Scrushy to seventy-months' imprisonment.  Scrushy appealed the district court's order denying his motion for a new trial.  This Court affirmed, concluding, in relevant part, that "Canary's limited involvement in [the] case did not deprive Scrushy of a disinterested prosecutor."  United States v. Scrushy, 721 F.3d 1288, 1303, 1307–08 (11th Cir. 2013).

While Scrushy's appeal was pending in our court, the same magistrate judge denied Siegelman's motion for additional discovery and the same district court denied Siegelman's motion for a new trial, which was based on, *inter alia*, the same allegations that Canary had failed to honor her voluntary disqualification.  Noting that Siegelman's motion "by and large copie[d] the one filed by Scrushy," the district court rejected Siegelman's argument that Canary's alleged failure to honor her disqualification deprived him of his right to a disinterested prosecutor.  Order Den. Siegelman New Trial Mot. at 2, 15–17.  The district court thereafter issued an amended final judgment sentencing Siegelman to seventy-eight-months' imprisonment.  Siegelman now appeals, arguing that he is entitled to appellate

6

relief because the district court (1) abused its discretion in denying his motion for a new trial, and (2) erred in calculating his sentence under the Guidelines.

## DISCUSSION

We begin our analysis by considering whether the district court erred in denying Siegelman's motion for a new trial based upon U.S. Attorney Leura Canary's alleged failure to honor her disqualification. As to that, we affirm the district court's order denying Siegelman's motion for a new trial. Next, we consider whether the district court improperly calculated Siegelman's sentence on remand. Finding no reversible error in the district court's sentencing calculation, we also affirm the district court's amended final judgment sentencing Siegelman to seventy-eight-months' imprisonment.

## I. New Trial Motion

Although the district court denied Siegelman's motion for a new trial on several grounds, the only ground at issue on appeal relates to U.S. Attorney Canary's alleged failure to honor her disqualification. Canary voluntarily disqualified herself in May 2002, before Siegelman and Scrushy were indicted. Scrushy, 721 F.3d at 1298 n.23. Siegelman's lawyer had requested Canary's disqualification based on an alleged conflict of interest flowing from Canary's husband, who had worked as a paid consultant for Siegelman's political opponents. Id. Although the Department of Justice had advised Canary "that no actual

7

conflicts of interest exist," she nonetheless removed herself from the defendants'

prosecution out of "an abundance of caution."  Press Release, U.S. Attorney Leura

Canary (May 16, 2002), Scrushy's New Trial Mot., Exhibit  III-B.  Eventually,

Acting U.S. Attorney Louis Franklin was appointed to oversee the case.  Scrushy,

721 F.3d at 1298 n.23.

On appeal, Siegelman argues that the district court should have granted his

motion for a new trial because he presented sufficient evidence to show that

Canary violated his right to a disinterested prosecutor under Young v. United

States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 814 (1987) (plurality) (holding

that appointment of an interested prosecutor is a structural defect), by continuing

"to communicate with and influence the prosecution team long after" her voluntary

disqualification.  Appellant's Br. at 26.  The Government argues, in contrast, that

our decision in Scrushy—which addressed the exact same evidence Siegelman

relies on here—dictates that Siegelman's disinterested-prosecutor claim be rejected

under the law-of-the-case doctrine.  We agree with the Government.

As most commonly defined, the law-of-the-case doctrine "posits that when a

court decides upon a rule of law, that decision should continue to govern the *same

issues* in subsequent stages in the *same case*."  Pepper v. United States, 131 S. Ct.

1229, 1250 (2011) (emphasis added) (internal quotation marks omitted).

Importantly, we also have held that the doctrine applies to those issues decided on

8

a co-defendant's earlier but closely related appeal.  See United States v. Bushert, 997 F.2d 1343, 1356 (11th Cir. 1993) (holding that the co-defendants' prior appeal mooted any subsequent appeal by the defendant under the law-of-the-case doctrine because the defendant's appeal would have challenged the same joint motion that his co-defendants' appeal had unsuccessfully challenged).

Applying these principles, Scrushy binds our decision here.[4]  In Scrushy, we considered whether the district court abused its discretion in denying Scrushy's motion for a new trial.  See Scrushy, 721 F.3d at 1304–08.  In Scrushy's motion, he argued, *inter alia*, that Canary violated his right to a disinterested prosecutor under Young by failing to honor her voluntary disqualification.  To support his claim, "Scrushy offered emails and statements provided by a whistleblower in the U.S. Attorney's office, Tamarah Grimes, indicating that Canary had kept up with the case and contributed to litigation strategy" following her disqualification.  Id. at 1307.

Specifically, three main emails and an unsworn statement by the whistleblower were offered as evidence.  In one email that Canary sent to the prosecution team, she suggested that the team seek a gag order against Siegelman.

---

[4] There are some narrow exceptions to the law-of-the-case doctrine.  See United States v. Tamayo, 80 F.3d 1514, 1520 (11th Cir. 1996) ("We have recognized narrow exceptions to the law of the case doctrine, where there is new evidence, an intervening change in controlling law dictating a different result, or the appellate decision, if implemented, would cause manifest injustice because it is clearly erroneous.").  We conclude that none of these exceptions apply here, and Siegelman does not argue to the contrary.

Id.  In a second email, Canary merely forwarded a letter to the editor criticizing the grand jury investigation.[5]  Id.  The third email was sent by an Assistant U.S. Attorney, who indicated that Canary had approved of a staffing decision related to the Siegelman-Scrushy case.  Id.  The whistleblower's unsworn and conclusory statements suggested that Canary "maintained direct communication with the prosecution team, directed some action in the case, and monitored the case through members of the prosecution team."  Id.

After considering this evidence, we concluded in Scrushy that Canary's "limited involvement in [the] case did not deprive Scrushy of a disinterested prosecutor."  Id. at 1307–08.  In reaching this conclusion, we distinguished the Supreme Court's decision in Young, wherein the Court held that a defendant's right to a disinterested prosecutor was violated, thereby requiring reversal, when private counsel for a party that was the beneficiary of an earlier civil court order was later appointed to prosecute criminally an alleged violation of that order.  Young, 481 U.S. at 807–09, 814.  Unlike the conflict of interest at issue in Young, we explained that the allegations pertaining to Canary were different, concluding that

> [s]uch a clear conflict of interest does not exist in this
> case. . . . Scrushy makes no allegation that [Acting U.S.

---

[5] Acting U.S. Attorney Franklin indicated that "the prosecution team took no action in response to [these] emails."  Decl. of Louis Franklin, Ex. 4, Government Resp. to Defs.' New Trial Mots. and Mots. for Disc.

Attorney] Franklin had any conflict of interest. Moreover, there is no evidence that Canary's emails influenced any decisions made by the U.S. Attorney's office in prosecuting Scrushy.

Scrushy, 721 F.3d at 1307.

By focusing on the absence of evidence suggesting that Canary's conduct actually influenced prosecutorial decision-making, we necessarily concluded that Scrushy had not shown that Canary possessed sufficient control over the prosecution to implicate the right to a disinterested prosecutor under Young. As the Supreme Court explained in Young, the danger presented by a disinterested prosecutor flows from the broad power a prosecutor wields over a defendant:

> A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity.

481 U.S. at 807.

Because prosecutors are charged with making such critical decisions, there is a "*potential* for private interest to influence the discharge of public duty" whenever a prosecutor has a personal stake in the outcome of a case. Id. at 805. But, where, as here, the allegedly interested person does not possess control over prosecutorial decision-making, there is no comparable risk that private interests will infect a

11

defendant's prosecution.  Cf. id. at 806 n.17 (explaining that although counsel for the beneficiary of the court order could not "be in *control*" of a later contempt-action prosecution, such counsel may nonetheless "be put to use in *assisting* a disinterested prosecutor" (emphasis added)); Person v. Miller, 854 F.2d 656, 663–64 (4th Cir. 1988) (explaining that there is no error under Young where "disinterested government counsel" has "control over the critical prosecutorial decisions" even where an interested private party assists in the prosecution).

Thus, although Young categorically forbids an interested person from *controlling* the defendant's prosecution, it does not categorically forbid an interested person from having *any involvement* in the prosecution.

In his motion for a new trial, Siegelman relied on *the same* disinterested-prosecutor argument and *the exact same* evidence as Scrushy did.  Accordingly, our determination in Scrushy that Canary did not exercise sufficient control to trigger Young—which hinged on the absence of evidence that Canary actually influenced the prosecution—necessarily resolves Siegelman's current disinterested-prosecutor claim.  And, because the absence of prosecutorial control by Canary is dispositive here, this conclusion holds true even if we accept Siegelman's argument, raised for the first time on appeal, that Canary had a

12

stronger conflict of interest with respect to him.[6]  Cf. Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs, 263 F.3d 1151, 1154 (10th Cir. 2001) (rejecting the plaintiff's argument that his constitutional rights were violated when a privately-retained attorney *participated* in his state criminal prosecution because the plaintiff did not allege that the private attorney "effectively controlled critical prosecutorial decisions").

Thus, regardless of whether Canary possessed a stronger conflict of interest with respect to Siegelman, our determination in Scrushy that there was no evidence that Canary influenced the prosecution team—meaning there was no evidence that she possessed sufficient prosecutorial control to implicate Young—binds Siegelman on this appeal.  Following the law of the case as established in Scrushy, we therefore affirm the district court's order denying Siegelman's motion for a new trial.[7]

---

[6] Specifically, Siegelman argues for the first time on appeal that Canary had a more direct and personal financial conflict of interest with respect to him because Canary's husband was a political consultant for several of Siegelman's opponents, including one who was running against Siegelman for Governor around the time that the criminal investigation began.  Although we assume without deciding that Canary possessed a stronger conflict of interest with respect to Siegelman, we note that the individual who was running against Siegelman for Governor in 2002, and who was being supported by Canary's husband, did not win the Republican nomination and therefore did not directly oppose Siegelman.  And, in any event, our decision to affirm the district court is predicated on Canary's lack of control over the prosecution, not on the extent of her alleged conflict of interest.  It is worth noting again, however, that the Department of Justice looked into this and concluded "that no actual conflicts of interest exist."  Press Release, U.S. Attorney Leura Canary (May 16, 2002), Scrushy's New Trial Mot., Exhibit III-B.

[7] We also affirm the magistrate judge's denial of Siegelman's related motion for additional discovery on this issue.  See Scrushy, 721 F.3d at 1303 n.27.

## II. Sentencing

We now turn to Siegelman's sentencing arguments.[8]  According to Siegelman, this Court should reverse the district court's sentencing determination on two different grounds.  First, Siegelman argues that reversal is warranted because the district court failed to explain why Siegelman's conduct with respect to the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement qualified as "relevant conduct" under U.S.S.G. § 1B1.3.  Second, Siegelman argues that the district court miscalculated his sentence because the court's interpretation of relevant conduct was impermissibly broad.  We address each asserted ground for reversal in turn.

### A. Failure to Make Explicit Relevant-Conduct Findings

On remand for resentencing, the district court used Siegelman's bribery conviction—which was based on the Siegelman-Scrushy Exchange—as the offense of conviction under the Guidelines.  However, in calculating Siegelman's sentence for the bribery conviction, the district court considered conduct beyond just the Siegelman-Scrushy Exchange.  Specifically, the district court also considered conduct flowing from the Siegelman-Young-Bailey Sham

---

[8] In evaluating the propriety of Siegelman's sentence, we rely on the 2002 version of the Guidelines.  Although the district court resentenced Siegelman in 2007, the court applied the 2002 version of the Guidelines and neither party contests this on appeal.  See generally U.S.S.G. § 1B1.11 (explaining that a sentencing court should use the Guidelines in effect on the date that the defendant is sentenced unless such application would violate the *ex post facto* clause).

Transactions[9] and the Siegelman-Young Agreement.[10]  In so doing, however, the district court did not explicitly explain why the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement qualified as "relevant conduct" under § 1B1.3 with respect to Siegelman's bribery conviction.  Siegelman argues that the district court's failure to provide such an explanation requires reversal.

### 1. *Standard of Review*

Because Siegelman did not object to the district court's failure to explain why the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement qualified as relevant conduct, our review is only for plain error.  United States v. Vandergrift, 754 F.3d 1303, 1307, 1309 (11th Cir. 2014).  "We have discretion to correct an error under the plain error standard where (1) an error occurred, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  United States v. Duncan, 400 F.3d 1297, 1301 (11th Cir. 2005).

---

[9] Siegelman was convicted of one count of obstruction of justice for this conduct.  See supra p. 4.
[10] Siegelman was acquitted of all charges related to this conduct.  See supra p. 4.

15

### 2. *No Error Occurred*

Under § 1B1.3, a sentencing court must consider "relevant conduct" when calculating the Guidelines range for the offense of conviction. Because § 1B1.3 calls for a factual finding that certain conduct is "relevant" to the offense of conviction, see United States v. Valarezo-Orobio, 635 F.3d 1261, 1264 (11th Cir. 2011) (explaining that whether an act "qualifies as relevant conduct is a question of fact"), a sentencing court should make explicit relevant-conduct findings in order to facilitate appellate review, see United States v. Bradley, 644 F.3d 1213, 1293 (11th Cir. 2011) (explaining that "a district court should make explicit [those] factual findings that underpin its sentencing decision").

Importantly, however, a district court's failure to make such explicit findings does not preclude appellate review—and therefore does not warrant reversal— "where the court's decisions are based on clearly identifiable evidence." Id. For example, in Bradley, we found "no error, much less plain error, in the district court's failure to make specific factual findings because it [was] clear from the record what evidence the court credited in making its loss determination." Id. In so finding, we explained that the sentencing court reviewed the defendants' amount-of-loss arguments, but chose "instead to adopt the probation officer's [presentence report] and Addendum in their entirety." Id. Because it was clear

16

that the court was resolving all questions of fact in favor of the Government, we could "easily determine on which evidence the court relied." Id.

Here, it is undisputed that the district court failed explicitly to explain why Siegelman's conduct with respect to the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement was "relevant conduct" under § 1B1.3. However, in rejecting Siegelman's objection to the value-of-the-bribe calculation contained in the amended presentence report, the district court expressly listed both the amount and the source of the money it was using to calculate the value of the bribe. See Siegelman Resentencing Hr'g Tr. at 35–36. This list accounted for the $9200 payment that Young made to Siegelman and that Siegelman tried to conceal through the Siegelman-Young-Bailey Sham Transactions. See supra p. 3. The list also accounted for over three million dollars that arose out of the Siegelman-Young Agreement. See supra p. 3–4. By including this money in the value-of-the-bribe calculation, it is clear that the district court treated the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement as relevant conduct to the bribery offense of conviction even though the court failed to make an explicit finding to this effect.

Because it is clear to us what evidence the district court relied upon in calculating its sentence, the district court did not err by failing to provide an

explicit relevant-conduct explanation.  See Bradley, 644 F.3d at 1293.

Accordingly, reversal is not warranted on this basis.

### B. Guidelines Calculation

Siegelman next argues that reversal is warranted because the district court miscalculated his 151–188 month sentencing range under the Guidelines.  This sentencing range was based on an offense level of thirty-four and a category I criminal history.  The district court ultimately varied downward significantly, sentencing Siegelman to seventy-eight-months' imprisonment.[11]

On appeal, we focus on the propriety of the district court's initial calculation of the sentencing range under the Guidelines without respect to its ultimate downward variance.  According to Siegelman, the district court's calculation is flawed because it reflected an impermissibly broad interpretation of relevant conduct under § 1B1.3.  And as a result of this flaw, Siegelman argues that the district court necessarily erred in calculating the value of the bribe and in granting both an obstruction-of-justice adjustment and an upward departure for systemic and pervasive government corruption.

---

[11] This sentence is eight months longer than Scrushy's sentence on remand.  In sentencing Siegelman more harshly than Scrushy, the district court considered Siegelman's obstruction-of-justice conviction, as well as his role in soliciting the bribe from Scrushy.  See Siegelman Resentencing Hr'g Tr. at 127–128, 131 ("I cannot justify having the person who paid the bribe and benefited, himself, serve more time than the person who solicited it.").

18

### 1. *Standard of Review*

Although the Guidelines are not mandatory, district courts are required to begin the sentencing process by correctly calculating the sentencing range prescribed by the Guidelines. United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2006). This Court reviews a district court's sentencing-range calculation under an abuse-of-discretion standard. United States v. Register, 678 F.3d 1262, 1266 (11th Cir. 2012). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." Id. (internal quotation marks omitted).

Because conduct that is relevant to the offense of conviction is often included in the sentencing calculation pursuant to § 1B1.3, a district court's sentencing range is not accurate unless its relevant-conduct findings are also accurate. Thus, we first consider whether the district court clearly erred by treating conduct related to the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement as relevant conduct under § 1B1.3. See Valarezo-Orobio, 635 F.3d at 1264 (explaining that whether an act "qualifies as relevant conduct is a question of fact reviewed for clear error"); United States v. Valladares, 544 F.3d 1257, 1267 (11th Cir. 2008) (explaining that we review "the application of the relevant conduct guideline in § 1B1.3 to the facts of the case" for clear

19

error).  Next, we consider whether the district court properly applied the

Guidelines in light of the court's relevant-conduct determination.

### 2. *Relevant Conduct*

When calculating a defendant's sentencing range under the Guidelines, the

sentencing court must consider all "relevant conduct" as defined in § 1B1.3.  See

United States v. Blanc, 146 F.3d 847, 851–52 (11th Cir. 1998).  Because "the

limits of sentencing accountability are not coextensive with the scope of criminal

liability," Hamaker, 455 F.3d at 1336, 1338 (internal quotation marks and

alternations omitted), relevant conduct is broadly defined to include both

uncharged and acquitted conduct that is proven at sentencing by a preponderance

of the evidence.[12]  Id.  Under section 1B1.3, relevant conduct includes "all acts and

---

[12] Siegelman does not dispute that our precedent "uniformly states[] [that] relevant conduct of which a defendant was acquitted nonetheless may be taken into account in sentencing for the offense of conviction, as long as the government proves the acquitted conduct relied upon by a preponderance of the evidence."  United States v. Duncan, 400 F.3d 1297, 1304 (11th Cir. 2005) (internal alterations and quotation marks omitted); see also United States v. Culver, 598 F.3d 740, 752–53 (11th Cir. 2010), cert. denied, 562 U.S. 896 (2010); United States v. Smith, 741 F.3d 1211, 1226–27 (11th Cir. 2013) cert. denied, 135 S. Ct. 704 (2014).  Despite our clear precedent, Siegelman nonetheless urges us to require the Government to prove his acquitted conduct (i.e., his conduct with respect to the Siegelman-Young Agreement) by clear and convincing evidence.  According to Siegelman, a heightened evidentiary standard is warranted here because the district court's reliance on the acquitted conduct tripled his sentencing range.

omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant"—as well as "all reasonably foreseeable acts and omissions of others in furtherance of" jointly undertaken criminal activity— "that were part of the same course of conduct or *common scheme or plan* as the offense of conviction."  U.S.S.G. § 1B1.3(a)(1), (2) (emphasis added)[13]; see also U.S.S.G. § 1B1.3, cmt. n.3.  "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*."  U.S.S.G. § 1B1.3, cmt. n. 9(A).  "Accordingly, we consider whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to

---

Although the Supreme Court has acknowledged that some circuits have determined that "relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence," United States v. Watts, 117 S. Ct. 633, 637 (1997), we have not adopted such a rule.  We decline to consider whether to adopt such a rule here.  Cf. United States v. Villareal-Amarillas, 562 F.3d 892, 895–98 (8th Cir. 2009) (overruling circuit precedent recognizing the possibility that facts relied upon by the district court at sentencing may need to be proved by clear and convincing evidence in the "exceptional case" and explaining that "concerns about the tail wagging the dog were put to rest when Booker rendered the Guidelines advisory" (internal quotation marks omitted)); United States v. Fisher, 502 F.3d 293, 305 (3d Cir. 2007) (same).

[13] Section 1B1.3(a)(2) applies "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts."  We are satisfied that the offenses associated with the Siegelman-Scrushy Exchange, the Siegelman-Young-Bailey Sham Transactions, and the Siegelman-Young Agreement are of a character that would require grouping under § 3D1.2(d), and Siegelman does not expressly argue to the contrary.

be similar in kind." Valladares, 544 F.3d at 1268 (internal quotation marks omitted).

Here, the district court treated Siegelman's bribery conviction—which was based on the Siegelman-Scrushy Exchange—as the offense of conviction when calculating the sentencing range. And, although the Siegelman-Scrushy Exchange was the only conduct underpinning the bribery conviction, the district court treated conduct from the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement as relevant conduct at various points in its sentencing calculation. See, e.g., Siegelman Resentencing Hr'g Tr. at 12–17, 35–36. Contrary to Siegelman's arguments on appeal, we conclude that the district court did not clearly err in treating this conduct as relevant conduct because it "is plausible in light of the record viewed in its entirety" that both the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement were part of the same common scheme or plan as the Siegelman-Scrushy Exchange giving rise to the bribery conviction. Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985)

Specifically, the Siegelman-Young-Bailey Sham Transactions are substantially connected to the Siegelman-Scrushy Exchange by a common accomplice, Nick Bailey, Siegelman's close associate and former confidential assistant. Bailey facilitated the sham transactions by executing checks to both

22

Siegelman and Young to make it appear as though he, Bailey, had accepted the $9200 payment Young made to Siegelman. Similarly, Bailey helped Siegelman acquire and conceal the $500,000 donation from Scrushy in exchange for the seat on the CON Board.[14]

The Siegelman-Young Agreement is also substantially connected to the Siegelman-Scrushy Exchange by a common victim, common purpose, and similar *modus operandi*. Both offenses deprived the citizens of Alabama of the honest services of their Governor and therefore harmed a common victim. Moreover, both offenses were committed for the common purpose of obtaining power and money for Siegelman and his associates. The Siegelman-Young Agreement enriched both Siegelman's interests by facilitating a $50,000 donation from one of Young's clients to the Foundation and Young's interests by helping him obtain lucrative state- and local- government action. Similarly, the Siegelman-Scrushy Exchange enriched both Siegelman's interests by facilitating a $500,000 donation to the Foundation and Scrushy's interests by giving him a position on the CON

---

[14] Relying on a single sentence in our Siegelman II opinion, Siegelman argues that we have already tacitly concluded that the Siegelman-Young-Bailey Sham Transactions, which led to the obstruction-of-justice conviction, are not sufficiently related to the Siegelman-Scrushy Exchange for purposes of § 1B1.3. Specifically, in describing the basis for Siegelman's various charges, we stated that "[t]he obstruction of justice allegations involved conduct *unrelated* to the Siegelman-Scrushy bribery, mail fraud and conspiracy charges." Siegelman II, 640 F.3d at 1164 n.1 (emphasis added). When read in context, however, this statement merely clarified that the facts supporting the obstruction-of-justice charges differed from the facts supporting the other listed charges. Because our statement was not addressing relevant conduct under § 1B1.3, it does not bind us here.

23

Board.  Finally, these offenses also shared the same *modus operandi* because Siegelman used his political power and influence to effectuate both the Siegelman-Young Agreement and the Siegelman-Scrushy Exchange.[15]

Because the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement are substantially connected to the Siegelman-Scrushy Exchange by at least one of the four factors, the district court did not clearly err by treating the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement as relevant conduct when calculating the sentencing range for the bribery offense of conviction.  See United States v. White, 335 F.3d 1314, 1319 (11th Cir. 2003) (explaining that we will not find clear error unless, upon reviewing the record, we are left with the definite and firm conviction that a mistake has been committed).

---

[15] Siegelman argues that he should not be accountable for the conduct of others that rippled out from the Siegelman-Young Agreement because such conduct was "unknown and unforeseeable" to him.  We disagree.  Section 1B1.3 defines relevant conduct to include all conduct of others that is "both in furtherance of, and reasonably foreseeable in connection with" the offense of conviction.  U.S.S.G. § 1B1.3, cmt.  n.2.  A defendant's accountability for the conduct of others is determined by "the scope of the specific conduct and objectives" that the defendant agreed to undertake.  Id.  Siegelman and Young had an ongoing agreement wherein Siegelman would facilitate governmental action at Young's request and Young would provide money and other things of value at Siegelman's request.  This ongoing agreement was, by its nature, open-ended, encompassing a broad range of possible conduct to be carried out by many possible actors as a means of enhancing both Siegelman's and Young's financial interests.  The conduct that Siegelman challenges was therefore reasonably foreseeable in connection with the broad scope of his pay-for-play agreement with Young.

### 3. *Resulting Guidelines Calculation*

Having determined that the district court did not clearly err by treating the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement as relevant conduct, we turn to Siegelman's remaining arguments, namely that the district court erred in calculating the value of the bribe and in granting both an obstruction-of-justice adjustment and an upward departure for systemic and pervasive government corruption.  Because these arguments are premised on Siegelman's faulty assumption that the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement *do not* qualify as relevant conduct, we conclude that the district court did not err by: (1) accounting for the Siegelman-Young-Bailey Sham Transactions and the Siegelman-Young Agreement in calculating the value of the bribe;[16] (2) granting an obstruction-of-justice adjustment based on the Siegelman-Young-Bailey Sham Transactions;[17] or (3) granting the systemic and pervasive corruption upward departure based on the

---

[16] We note that the court failed to include the $500,000 connected to the Siegelman-Scrushy Exchange in calculating the value of the bribe.  However, because taking this additional money into account does not affect the offense level, the district court's oversight does not undermine our conclusion.

[17] Because the Siegelman-Young-Bailey Sham Transactions satisfy § 3C1.1, we need not consider whether the additional conduct that the district court relied upon would also qualify as obstructive conduct under § 3C1.1.  See Siegelman Resentencing Hr'g Tr. at 12–14.

loss of public confidence in the government of the State of Alabama.[18]  We

therefore affirm Siegelman's seventy-eight-month sentence.

## CONCLUSION

The district court's order denying Siegelman's motion for a new trial and the

district court's amended final judgment are **AFFIRMED**.

---

[18] This is the second time that we have affirmed the district court's upward departure for systemic and pervasive corruption.  See Siegelman II, 640 F.3d at 1190 (noting that Siegelman conceded at his initial sentencing that "certainly the argument could be made, in all candor, that there could be some question as to public confidence in this case").