[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12348
_____

D.C. Docket No. 8:18-cr-414-SCB-TGW-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DOMULEST DANZEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 14, 2021)

Before MARTIN, LUCK, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

Domulest Danzey appeals his 48-month sentence for conspiracy to commit

access-device fraud and aggravated identity theft, access-device fraud, and

aggravated identity theft. At his sentencing, the district court concluded that Danzey was accountable for a total intended loss of over $600,000. Just over $100,000 of that amount came from fraudulently obtained tax refunds for which Danzey claims he played no role in obtaining, knew nothing about, and could not have reasonably foreseen. He argues that the tax return losses were not a reasonably foreseeable consequence of the broader identity-theft conspiracy in which he participated and should not be considered relevant conduct for sentencing. After careful consideration of the record, we cannot say that the district court clearly erred in determining that the tax return losses were reasonably foreseeable to Danzey. Accordingly, we affirm.

## I. BACKGROUND

Danzey admitted to participating in an identity theft and credit card fraud scheme as part of his membership in the Manche Boy Mafia, a criminal gang based in Tampa, Florida. Danzey and other gang members purchased stolen personal identification information as well as stolen credit and debit card account numbers from various websites on the "dark web." Using the stolen information, Danzey and other gang members created counterfeit credit cards by embossing the stolen credit and debit card account information onto prepaid, reloadable gift cards. They would then purposefully damage the magnetic strips on the backs of those cards to ensure that the cards could not be read by a merchant's point-of-sale card reader. Instead,

the unknowing cashier would manually enter the stolen account numbers. Danzey and his co-conspirators used these counterfeit credit cards to purchase more gift cards and other items from various retail establishments in the Tampa area. Other members of the conspiracy used that stolen personal identification information to file fraudulent tax refund applications with the Internal Revenue Service.

The identity-theft conspiracy was run out of a small outbuilding at a property in Tampa, Florida. The outbuilding was occupied by John Render, who embossed many of the counterfeit credit cards. The outbuilding also served as a "hangout" for Render's co-conspirators. John's sister, Whitney Render, had her residence in the main building at that address.

Eventually, law enforcement officers executed a search of both the outbuilding and Whitney Render's residence. In the main room of the outbuilding, they found Danzey and other gang members surrounded by counterfeit credit cards, gift cards, stolen credit card numbers, stolen personal identification information, and other evidence. Danzey was found lying on the ground near the couch in the main room. On top of the couch, officers found a printed list of names, birthdates, and social security numbers. Beneath the couch, they found Danzey's phone and counterfeit credit cards bearing Danzey's name. Investigators discovered 186 credit card and social security numbers stored on Danzey's phone. In John Render's bedroom, police found more printed lists of names, birthdates, and social security

3

numbers, along with at least two credit cards bearing Danzey's name. After contacting the IRS, investigators determined that the personal identification information found in John Render's bedroom had been used to file fraudulent tax returns seeking refunds totaling $109,244.

In Whitney Render's house, police found more counterfeit credit cards, and several cellphones belonging to co-conspirators. One of the cell phones belonged to Whitney Render and contained text messages in which she and Danzey had exchanged stolen credit card information. Another phone belonged to co-conspirator Derek Walden. Walden's phone also contained stolen credit card information. Investigators later determined that Walden's phone had been used to access multiple tax websites.

A federal grand jury indicted Danzey under 18 U.S.C. § 371 for one count of conspiracy to commit access-device fraud in violation of 18 U.S.C. § 1029(a)(1) and to commit aggravated identity theft in violation of 18 U.S.C. § 1028A, three counts of access-device fraud, and four counts of aggravated identity theft. The government proposed a plea agreement that Danzey rejected because it contained additional facts not needed to prove the elements of the charged crimes, including facts regarding the tax return losses of which Danzey claimed to be unaware. His attorney explained that "as far as . . . having indirect knowledge or direct knowledge as to what the co-conspirators were doing . . . he may have had an idea, but he has no specific

4

knowledge of that." Instead, he opted for an open plea, at which point he pleaded

guilty to all charges without a written agreement.

In the Presentence Investigation Report, the probation officer held Danzey

accountable for a total loss of more than $600,000, using that amount to determine

his total offense level. That amount included both a loss of over $500,000 from the

fake credit cards and a loss of over $100,000 from tax refunds that Danzey's co-

conspirators fraudulently claimed using stolen personal identification information.

Danzey objected in writing and at the sentencing hearing to the court's inclusion of

those refunds in its total loss calculation. He argued that he lacked knowledge of the

tax return fraud and that it was not reasonably foreseeable to him. The district court

overruled his objection, however, determining that the tax return fraud was relevant

conduct for sentencing purposes and that the tax return losses were a reasonably

foreseeable consequence of the identity-theft conspiracy. The court explained:

> [Y]ou seem to be involved in [the identity theft] scheme based on what
> the testimony was, and based on what you've admitted to . . . not only
> by participating in it and attempting to use the cards, but by being
> present at the place where many of them were obviously being collected
> or manufactured, . . . where the list of personal identifying information
> were just lying out in the open. And, you know, what I have to decide
> is it reasonably foreseeable to you as a member of this conspiracy as far
> as the loss in all of these categories, and the amount of the loss and I
> think it is.

The inclusion of the tax return losses did not affect Danzey's aggravated-

identity-theft sentence. U.S.S.G. § 2B1.6 ("If the defendant was convicted of

violating 18 U.S.C. § 1028A, the guideline sentence is the term of imprisonment required by statute."). But it did raise his total offense level for the other counts from 19 to 21, which in turn increased his advisory sentencing range from 30 to 37 months to 37 to 46 months. *Compare* U.S.S.G. § 2B1.1(b)(1)(G) (directing a court to increase a defendant's base offense level by 12 for losses of more than $250,000 but less than $550,000), *with* U.S.S.G. § 2B1.1(b)(1)(H) (providing for an increase in a defendant's base offense level of 14 for losses of more than $550,000 but less than $1,500,000). On these other counts, the district court varied downward, sentencing Danzey to 24 months' imprisonment. The district court then imposed the aggravated-identity-theft's mandatory consecutive sentence of 24 months, for a total sentence of 48 months. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews a district court's interpretation and application of the sentencing guidelines *de novo* but accepts its factual findings unless they are clearly erroneous. *United States v. Tejas*, 868 F.3d 1242, 1244 (11th Cir. 2017). Whether a co-conspirator's act was reasonably foreseeable to the defendant so that it qualifies as relevant conduct for sentencing is a question of fact reviewed for clear error. *United States v. Valarezo-Orobio*, 635 F.3d 1261, 1264 (11th Cir. 2011). We reject a factual finding as clearly erroneous only if we are "left with a definite and firm conviction that a mistake has been committed." *United States v. Pierre*, 825 F.3d

6

1183, 1191 (11th Cir. 2016) (quoting *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010)). We will affirm the district court's finding if it is "plausible in light of the record viewed in its entirety." *United States v. Siegelman*, 786 F.3d 1322, 1333 (11th Cir. 2015) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

### III. DISCUSSION

Danzey appeals the district court's decision to include over $100,000 of fraudulently applied-for tax refunds in the total loss amount for which he was sentenced. He argues that the district court clearly erred by finding that losses attributable to the tax return fraud were reasonably foreseeable to him. He contends that evidence supporting the court's finding was "nonexistent" and that any inference that he knew or should have known about the tax return fraud "would be pure speculation." He also notes that the government failed to produce any evidence that he was directly involved in the tax return fraud. The government responds with undisputed evidence showing that the tax return fraud was conducted in close physical proximity to Danzey—in the same outbuilding where he carried out the credit card scheme—and relied on the same personal identification information that Danzey and his co-conspirators obtained on the dark web. The government contends that the record supports the district court's determination that the losses inflicted by

7

the tax return fraud were reasonably foreseeable to Danzey. For the reasons that follow, we agree.

To begin, we must clarify the question presented on appeal. The relevant question before us is not whether Danzey was *actually involved* in the tax return fraud or whether he had *actual knowledge* that others were engaged in tax return fraud. Instead, we must decide whether the district court clearly erred when it determined that the tax return losses were a reasonably foreseeable consequence of the ongoing identity-theft conspiracy. U.S.S.G. § 1B1.3(a)(1)(B) (providing that, in the case of jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of the criminal activity can count towards offense characteristics); *see Pierre*, 825 F.3d at 1198 (a sentencing court "may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators") (quoting *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010)). Danzey's arguments that he did not know of or participate in the tax return fraud therefore miss the point. The question is whether Danzey—after purchasing stolen personal identification information for use in opening fraudulent credit and debit card accounts—ought to have foreseen that the conspiracy would use personal identification information to commit other types of financial fraud as well. We have held that members of a criminal conspiracy need not be involved in—or even aware of—losses inflicted by other members of the

8

conspiracy for those losses to be reasonably foreseeable. *See Mateos*, 623 F.3d at 1371 (holding that it was "reasonably foreseeable that a clinic engaged in fraudulently diluting doses of medicine [to bill Medicare] might also be in the practice of billing Medicare when no treatment was provided whatsoever").

Nor is this a case in which the district court engaged in improper speculation regarding the total loss amount. Danzey cites several of our precedents for the proposition that "courts 'must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines.'" *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997) (quoting *United States v. Wilson*, 993 F.2d 214, 218 (11th Cir. 1993)). But *Sepulveda* and *Wilson* involved speculation regarding the calculation of the loss amount itself, with the government unable to provide a "reasonable estimate of the loss." *Sepulveda*, 115 F.3d at 891; *Wilson*, 993 F.2d at 218. That is not the case here, where the loss attributable to the tax return fraud has been calculated with precision. Nor is this a case like *United States v. Isaacson*, 752 F.3d 1291, 1306 (11th Cir. 2014), where we declined to attribute losses from one conspiracy to defraud a pool of investors to a defendant involved in a separate conspiracy to defraud a group of auditors. Here, the tax return fraud and the credit card fraud were components of the same overarching identity-theft conspiracy. Both frauds were run out of the same small outbuilding and targeted the

9

same class of victims—individuals whose personal information Danzey and his co-conspirators purchased online.

On this record, we cannot say that the district court clearly erred. The district court's determination that the tax return losses were a reasonably foreseeable consequence of the identity-theft conspiracy was a plausible reading of the record. The district court's decision was supported by several key pieces of evidence.

First, at the sentencing hearing, the district court heard testimony from a detective about Danzey's role in the identity-theft conspiracy. The detective testified that Danzey was present in John Render's outbuilding in the early morning when the search warrant was executed, along with many counterfeit credit cards, gift cards, stolen account numbers, stolen personal identification information, and other evidence. Critically, she testified that pieces of paper containing the names, birth dates, and social security numbers used to commit tax return fraud were found "out in the open" in John Render's bedroom—the same room where police found several credit cards embossed with Danzey's name. She also testified that police recovered Danzey's phone from the outbuilding. On it, they discovered "approximately 186 card numbers and Social Security numbers"—more than they found on the phone of

any other conspirator and a majority of the approximately 261 recovered from all cell phones seized in the search. Danzey disputes none of this testimony.

Second, Danzey never disputed—and is thus "deemed to have admitted," *see United States v. Corbett*, 921 F.3d 1032, 1042 (11th Cir. 2019) (quoting *United States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014))—the following facts contained in the PSR: that he and his co-conspirators purchased stolen personal identification information over the internet; that the same personal identification information that Danzey and his co-conspirators used to apply for unauthorized credit and debit card accounts was used by his co-conspirators to file fraudulent tax returns; and that at least eight of the counterfeit credit cards recovered from the outbuilding—including the bedroom where tax documents were lying out in the open—were embossed with his own name.

This evidence shows that Danzey was deeply involved in procuring the personal identification information that he and his co-conspirators used to open lines of credit in other individuals' names and that his co-conspirators used to file fraudulent tax returns. Because he did not use social security numbers and birthdates to commit credit card fraud, which required only names and account numbers, the social security numbers on his phone would have been useful only to commit some other kind of fraud, such as the tax fraud committed by his co-conspirators. And with much of the conspiracy being run out of a single small outbuilding, it would be

11

reasonable for a factfinder to infer that Danzey knew what his co-conspirators were up to. At his change of plea hearing, Danzey's attorney nearly admitted as much, explaining that, although Danzey "may have had an idea" of what his co-conspirators were doing with the stolen information, he lacked "specific knowledge of that."

But specific or actual knowledge is not required, only reasonable foreseeability. On this point, Danzey asks us to hold that the district court was constrained to find that the tax return fraud was tightly sealed within John Render's bedroom and that he was unable to know or even foresee what was occurring there—despite the fact that the information he stole and credit cards embossed with his name were scattered throughout the entire house, including that bedroom. But we are not bound by Danzey's description of his involvement in a criminal conspiracy to which he pleaded guilty. We are bound by law to affirm the district court's factual determination unless it is clearly erroneous.

Our dissenting colleague sees things differently and makes three points that warrant a response. First, she correctly explains that Danzey disputed portions of the PSR. But we believe those disputes are beside the point: the *undisputed* portions of the PSR (along with the officer's testimony) provide sufficient evidence for a factfinder to find that the tax fraud was reasonably foreseeable. Second, our dissenting colleague suggests that the tax fraud may have been temporally or

12

physically distant from Danzey's participation in the conspiracy. But the record establishes that eight of Danzey's fake credit cards were discovered in the outbuilding along with personal information that his co-conspirators used to commit the tax fraud. The police found these two sets of documents—fake credit cards with Danzey's name and the information used to commit the tax fraud—at the same time, in the same place, when Danzey was present. A reasonable factfinder could conclude that the tax fraud and credit card fraud were carried out simultaneously. Third, she suggests that our decision is inconsistent with a "workable rule" for gauging whether a person is responsible for his co-conspirator's actions. But we have held that the district court's ruling on this question is a factual determination that we review for clear error. *See Valarezo-Orobio*, 635 F.3d at 1264. Accordingly, our decision means merely that there was sufficient evidence in this record to affirm the district court's finding in this case.

The evidence presented to the district court established a sufficient basis to find by a preponderance of the evidence that Danzey ought to have reasonably foreseen the tax losses related to the identity-theft conspiracy. At minimum, there is

enough evidence in the record "viewed in its entirety" to hold that the district court's

finding was "plausible." *Siegelman*, 786 F.3d at 1333.

## IV. CONCLUSION

Because the record contains sufficient evidence to support the district court's

determination that Danzey ought to have reasonably foreseen the tax return losses,

the court did not clearly err in its calculation of total loss.

**AFFIRMED**.

MARTIN, Circuit Judge, dissenting:

Because I believe the District Court committed clear error in attributing the loss amounts from the tax fraud scheme to Mr. Danzey, I respectfully dissent.

Mr. Danzey pled guilty to a conspiracy to commit (1) access-device fraud and (2) aggravated identity theft. Thus his case raises the question of whether the District Court clearly erred in finding the tax fraud committed by his co-conspirator was reasonably foreseeable to him. Because this record does not support a finding that the tax fraud was reasonably foreseeable to Mr. Danzey, I would reverse the District Court on this point.

To begin, the paper with the personal identification information used to file the fraudulent tax returns resulting in the $109,244 tax loss was found in the bedroom of another MBM member, and not in Mr. Danzey's immediate physical proximity. As Mr. Danzey points out, there is no evidence to show that the personal identification information found in his physical proximity was used to file fraudulent tax returns. Nor was there any evidence that the Social Security numbers on Mr. Danzey's phone were used in the tax fraud. The government cannot be heard to say otherwise.

The majority opinion says Mr. Danzey "never disputed" the fact that "the same personal identification information that Danzey and his co-conspirators used to apply for unauthorized credit and debit card accounts was used by his co-

15

conspirators to file fraudulent tax returns." Maj. Op. at 11 (emphasis added). The majority relies on two paragraphs of Mr. Danzey's Presentence Investigation Report (PSR) as support. But I don't read the PSR to state that the "same" personal identification information that Mr. Danzey used in the credit card fraud scheme was used in the tax fraud scheme. See PSR ¶¶ 22, 24. Rather, what the PSR contains in paragraph 22 is a summary of the conduct the probation office attributed to Mr. Danzey. Then in paragraph 24, the PSR contains a calculation of the loss amounts from the tax fraud scheme. And though the majority says Mr. Danzey "never disputed" the facts the majority recounts, Mr. Danzey did object to paragraphs 22 and 24, and other sections of the PSR as well. See PSR Amended Addendum at 1–2 (Defendant's Objections). Mr. Danzey lodged both written and oral objections to the PSR, and now continues to dispute the "[r]elevant [c]onduct" that may properly be attributed to him on appeal. Id. at 1.

I believe the majority's reliance on United States v. Mateos, 623 F.3d 1350 (11th Cir. 2010) is misplaced. See Maj. Op. at 8–9. That case addressed Ms. Mateos's argument that she could be held responsible only for fraudulent Medicare billings for patients "actually injected with unnecessary medicine; not to billing Medicare when no treatment was provided at all." Mateos, 623 F.3d at 1371. That obvious attempt to exclude this fraudulent conduct from the definition of fraud was rejected by the panel. The opinion said it was "reasonably foreseeable that a clinic

16

engaged in fraudulently diluting doses of medicine [to bill Medicare] might also be in the practice of billing Medicare when no treatment was provided whatsoever." Id. At the end of the day, the panel observed, Ms. Mateos "knew that [the hospital] was purchasing far less [medicine] than it was billing Medicare for, and that was the essence of the fraud." Id.

We are, however, on quite different terrain here. In urging affirmance of the District Court's finding, the government chiefly argues that Mr. Danzey was believed to be a member of MBM and that the gang engaged in tax fraud generally. The government argues as well that the personal identification information was left in the open in an area where Mr. Danzey was present, and generally, he was communicating with other MBM members who committed tax fraud. The government says this made it reasonably foreseeable to Mr. Danzey that others committed tax fraud simply "because it's something [the others] were engaging in."

But there are several problems with the government's reading of the record, which the majority nevertheless adopts. See Maj. Op. at 7–10. First, there's the problem of timing. Although MBM may have engaged in tax fraud "early on," the parties do not specify what time period this refers to. I do not believe the majority can properly assume that any tax fraud scheme necessarily overlapped with Mr. Danzey's involvement in MBM. This record is simply devoid of evidence about either when the tax fraud was committed or when Mr. Danzey joined MBM. Second,

17

there's the matter of MBM's group coherence. The government's chief witness at sentencing, Detective Sharla Canfield, testified about the MBM gang, saying, "As for hierarchy, we haven't been able to identify any type of hierarchy. It's more of the guys that like to hang out together and live in that geographical area." That Mr. Danzey was known to "hang out" with or lived nearby people who were committing tax fraud is not enough to show that Mr. Danzey would have reasonably foreseen this type of criminal activity by other MBM members. And third, as previously mentioned, there is nothing in the record to support the inference that the personal identification information near Mr. Danzey was also used for fraudulent tax returns. The government's witness simply never testified to this fact.

Finally, I also note that the facts of Mr. Danzey's case are different from those in which courts have affirmed loss calculations based on conduct actually reasonably foreseeable to the criminal defendant. To take one example, in United States v. Rodriguez, 751 F.3d 1244 (11th Cir. 2014), this Court held that the district court did not clearly err in attributing losses to a defendant convicted of a mortgage scheme. Id. at 1256. The scheme involving Ms. Rodriguez included a number of fraudulent loan applications submitted to lenders across the United States seeking loans on various properties. Id. at 1248. Ms. Rodriguez contested including the loss amounts associated with the fraudulent use of her post office boxes, arguing that the use of her post office boxes was too tenuous a connection to the fraud. Id. at 1256. Ms.

18

Rodriguez argued that she had not worked for her co-conspirator during the entire length of the conspiracy. Id. Nevertheless, our Court ruled that such loss amounts were reasonably foreseeable because "rerouting the mail was essential to the success of the fraudulent scheme," and Ms. Rodriguez "participated in the conspiracy and did not withdraw from it." Id. at 1256–57. In contrast here, the government has shoehorned separate criminal activity, of a different kind and nature, into the ambit of Mr. Danzey's offenses of conviction. But to punish Mr. Danzey for this conduct, the government was required to prove, by a preponderance of the evidence, that the separate activity was foreseeable to him. It simply did not do so.[1]

On this record, I believe the District Court lacked any viable basis for attributing the $109,244 from the tax fraud activity to Mr. Danzey in its loss calculation. I would vacate Mr. Danzey's sentence and remand for resentencing. Therefore I respectfully dissent.

---

[1] The majority's approach is also hard to square with any workable rule defining what constitutes reasonably foreseeable co-conspirator conduct. As the government noted at sentencing, even though Mr. Danzey was in communication with a co-conspirator, Reggie Black, about credit card fraud, it conceded that "we aren't hoping that the Court will hold him accountable for everything that Reggie [Black] did, only the limited portion on the phone where he was communicating with him about credit card fraud." The same limitation should apply to the fraudulent tax activities engaged in by Mr. Danzey's co-conspirators. Yet the majority's reasoning punishes Mr. Danzey for more conduct than even the government—rightfully, in this example—recognizes was reasonably foreseeable to him.