[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 13, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-11160

_____

D.C. Docket No. 02-20969-CR-PCH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUIS ENRIQUE POLAR,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

**(May 13, 2004)**

Before BIRCH, KRAVITCH and OAKES[*], Circuit Judges.

BIRCH, Circuit Judge:

Luis Enrique Polar appeals his conviction and sentence for possessing and

obtaining a falsely-made, forged, and counterfeited United States Immigration and

_____

[*] Honorable James L. Oakes, United States Circuit Judge for the Second Circuit, sitting by designation.

Naturalization Alien Documentation Identification Telecommunication ("ADIT") stamp, in violation of 18 U.S.C. § 1546(a).[1]  For the reasons set forth below, we AFFIRM Polar's conviction.

## I. BACKGROUND

A. The Trial

During a four-day jury trial, Agent Ramon Llorca, an agent with the Social Security Administration ("SSA") Office of the Inspector General ("OIG"), testified that an investigation had revealed that several aliens had presented passports containing fraudulent ADIT stamp marks in the Hialeah and Fort Myers, Florida SSA offices.  SSA/OIG agents subsequently arrested Gavriel Finbarb for possessing a counterfeit ADIT stamp, in violation of 18 U.S.C. § 1546.  Agent Llorca and Finbarb testified that, after Finbarb agreed to cooperate with the government and identified Polar as the source of the counterfeit ADIT stamp mark, Finbarb placed monitored and recorded telephone calls to Polar to discuss obtaining an ADIT stamp.

---

[1]  Evidence adduced at trial showed that an ADIT stamp mark is placed in an alien's passport at a port of entry or at an Immigration and Naturalization Service ("INS") district office; that this stamp mark serves as temporary proof of lawful permanent residence in the United States; and that this stamp mark serves as INS authorization for employment, such that a passport with an ADIT stamp mark can be used as identification to obtain a valid Social Security card.

Finbarb further testified that, during these calls, Polar described obtaining

Social Security cards with a stamped passport and instructed Finbarb to send

aliens with illegally-stamped passports to particular SSA offices.  Also, while

under surveillance, Finbarb twice met with Polar and paid Polar $800 in exchange

for Polar returning to Finbarb a passport with a counterfeit ADIT stamp mark.

At the charge conference, Polar moved the district court to include a jury

instruction on willfulness.  Polar argued that the offense criminalized by 18 U.S.C.

§ 1546(a) is a specific-intent offense that requires proof that the defendant acted

willfully.  Over Polar's objection, the district court instructed the jury without

including Polar's proposed instruction on willfulness.[2]

---

[2] The district court specifically instructed the jury as follows:

> The indictment charges the defendant with violation of Title 18 United
> States Code, Section 1546(a).  That provision makes it a federal crime for
> anyone to *knowingly* possess a false or counterfeit Visa or other document
> required as evidence of an unauthorized stay or employment in the United
> States.  Defendant can be found guilty of that offense only if all the
> following facts are proved beyond a reasonable doubt:

> First, that the defendant *knowingly* possessed the document required as
> evidence of an unauthorized stay or employment in the United States as
> charged in the United States.

> And second, in doing so the defendant acted *with knowledge* that such document
> had been forged, counterfeited, altered or falsely made.

R3 at 84-85 (emphasis added).

## B. The Jury Deliberations

During their first day of deliberations, the jurors sent the district court a note stating that "11 out of 12 jurors have come to a verdict. One wishes to abstain from making any a [sic] verdict. How do we proceed?" R1-42; R3-92. In response, the district court instructed the jurors, before dismissing them for the evening, that any verdict they rendered had to be unanimous.

After deliberating further, the jurors sent the district court a second and third note, the latter of which requested that the district court dismiss a juror who refused to vote and who indicated a mistrust of and bias against the government and the criminal justice system. The government, in turn, moved the district court to excuse the juror, pursuant to Federal Rule of Criminal Procedure 23(b). After questioning the jury foreperson to investigate further the jury's concerns about the uncooperative juror, the district court separately interviewed the juror, Guillermo Bonilla. Following this interview, the jurors, including Juror Bonilla, returned to deliberations and unanimously found Polar guilty as charged.

## C. Sentencing

Polar's presentence investigation report ("PSI") set Polar's total offense level at 21. The PSI set the base offense level at 11, pursuant to U.S.S.G. § 2L2.1(a), and then recommended two upward adjustments based on specific

4

offense characteristics. It recommended a six-level upward adjustment, pursuant to U.S.S.G. § 2L2.1(b)(2)(B), because the offense involved at least 25 documents. It also recommended a four-level upward adjustment, pursuant to U.S.S.G. § 2L2.1(b)(3), because Polar "knew, believed, or had reason to believe that a passport or visa was to be used to facilitate the commission of a felony offense"—in Polar's case, fraudulently obtaining Social Security numbers. U.S.S.G. § 2L2.1(b)(3) (Nov. 2001). Over Polar's objections to both upward adjustments, the district court adopted the recommendations of the PSI and sentenced Polar to 37 months of imprisonment.

## II. DISCUSSION

On appeal, Polar asserts four points of error: First, the district court erred in refusing to give his proposed jury instruction requiring a finding of willfulness. Second, the district court erred in individually questioning and instructing a juror during deliberations. Third, the district court erred by increasing Polar's base offense level by six levels, pursuant to U.S.S.G. § 2L2.1(b)(2)(B), based on its finding that 25 or more illegally-stamped passports were attributable to Polar. Fourth, and finally, the district court erred in increasing Polar's base offense level by four levels, under U.S.S.G. § 2L2.1(b)(3), based on its conclusion that Polar had knowledge or reason to believe that the stamped passports would be used to

5

facilitate the commission of a *non-immigration* felony offense.  We consider, and ultimately reject, each of these arguments in turn.

A. The District Court's Refusal to Give "Willfulness" Jury Instruction

Polar first argues that the district court erred in failing to give his proposed instruction on willfulness.  Polar argues that § 1546(a) requires proof of specific intent and that the district court therefore should have instructed the jury that willfulness was an element of the offense.

We review "a district court's refusal to give a proposed jury instruction for an abuse of discretion."  United States v. Futrell, 209 F.3d 1286, 1288 (11th Cir. 2000).  This refusal constitutes "reversible error only if (1) the instruction is substantially correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense."  United States v. De La Mata, 266 F.3d 1275, 1298 (11th Cir. 2001).

We find the first prong—the requirement that the rejected instruction was a substantially correct statement of the law—to be dispositive here.  Neither the language of the statute nor case law interpreting it supports Polar's novel contention that § 1546(a) requires proof of willfulness.  The statute reads, in relevant part:

Whoever *knowingly* forges, counterfeits, alters, or falsely makes any . . . document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such . . . document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made . . . [s]hall be fined under this title or imprisoned . . . .

18 U.S.C. § 1546(a) (emphasis added). Nothing in this language suggests a scienter requirement beyond that the requirement that the defendant acted "knowingly." Indeed, under the principle of <u>expressio</u> <u>unius</u> <u>est</u> <u>exclusio</u> <u>alterius</u>, the statute's inclusion of the word "knowingly" tilts against any possibility that Congress intended any additional scienter requirement. Polar does not cite to us, nor does our own research reveal, any cases interpreting the statute to include a willfulness element.

Polar, however, cites the Eleventh Circuit pattern jury instruction for § 1546(a), which does require the jury to find that "the Defendant acted willfully and with knowledge" that the passport had been counterfeited. <u>Eleventh Circuit Pattern Jury Instructions (Criminal Cases)</u>, Special Instruction No. 58.[3]

---

[3] The Eleventh Circuit's pattern jury instruction provides, in relevant part:

The Defendant can be found guilty of [18 U.S.C. § 1546] only if all of the following facts are proved beyond a reasonable doubt:

First: That the Defendant knowingly [possessed] . . . a[n] [immigrant or nonimmigrant visa] . . . [as evidence of authorized stay or employment in] the

According to Polar, this instruction "makes plain [that] willfulness is an element of the crime with which Mr. Polar was charged." Appellant's Br. at 18. Pattern jury instructions, however, cannot trump the plain language of a statute. As we have noted elsewhere, pattern jury instructions "are not precedent and cannot solely foreclose the construction of the necessary elements of a crime as stated in the statute." See United States v. Ettinger, 344 F.3d 1149, 1158 (11th Cir. 2003).[4] We conclude that the district court did not abuse its discretion in refusing to give Polar's proposed instruction on willfulness.

B. The District Court's Questioning of Juror Bonilla

Second, Polar argues that the district court denied him his Sixth Amendment right to a trial by a jury of his peers by singling out the allegedly uncooperative juror, Juror Bonilla, for questioning and by giving him what Polar characterizes as an unduly coercive Allen charge.

---

United States, as charged; and

Second: That in so doing the Defendant acted willfully and with knowledge that such [immigrant or nonimmigrant visa] . . . [had been forged, counterfeited, altered or falsely made] . . . .

Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Special Instruction No. 58.

[4] In passing, Polar also contends that the rule of lenity requires that 18 U.S.C. § 1546 be interpreted to require an element of willfulness. However, the rule of lenity only applies if a statute is ambiguous. United States v. Jeter, 329 F.3d 1229, 1230 (11th Cir. 2003). Section 1546(a) is not ambiguous on the question of willfulness: the statute only requires that the defendant acted with knowledge.

To the extent that Polar is challenging the district court's one-on-one questioning of Juror Bonilla to investigate alleged juror misconduct, the district court's action is reviewed only for an abuse of discretion. United States v. Prosperi, 201 F.3d 1335, 1340 (11th Cir. 2000). Here, the district court had adequate reason to question Juror Bonilla in order to investigate potential misconduct. Under Rule 23(b), "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Fed. R. Crim. P. 23(b)(3). "Just cause exists to dismiss a juror when that juror refuses to apply the law or to follow the court's instructions." United States v. Abbell, 271 F.3d 1286, 1302 (11th Cir. 2001), cert. denied, 537 U.S. 813, 123 S.Ct 74 (2002).

The jurors here sent the district court three separate notes complaining of an uncooperative juror. The third and final note requested that the judge dismiss the juror, who was refusing to vote and had indicated a bias against the government and the criminal justice system. The government, in turn, had moved the district court to excuse him, pursuant to Rule 23(b). Under the circumstances, the district court's one-on-one interview of Juror Bonilla was not only appropriate, but was even necessary so as to avoid premature or unjustified dismissal. Id. ("Because of the danger that a dissenting juror might be excused under the mistaken view that

9

the juror is engaging in impermissible nullification," a juror should be excused only when the district court satisfies itself, beyond a reasonable doubt, that no "substantial possibility" exists that the juror is basing his or her decision on the sufficiency of the evidence.). We conclude that the district court properly exercised its discretion in making necessary inquiry to determine whether there was sufficient cause to dismiss Juror Bonilla under Fed. R. Crim. P. 23(b).

Polar also attempts to characterize the district court's exchange with Juror Bonilla as an unduly coercive <u>Allen</u> charge. An "<u>Allen</u> charge" is a trial court's admonition to a deadlocked jury, instructing it to make further attempts to reach a verdict. <u>See</u> <u>United States v. Brokemond</u>, 959 F.2d 206, 208 n.2 (11th Cir. 1992) (citing <u>Allen v. United States</u>, 164 U.S. 492, 17 S.Ct. 154 (1896)). The district court's dialogue with Juror Bonilla, however, was not an <u>Allen</u> charge—and thus need not be scrutinized as one. Polar's <u>Allen</u> charge objections are directed at the following exchange between the district court and Juror Bonilla:

> THE COURT: Will you follow the law, all of the law that I have instructed you on? You recall I told you and all the jurors that, I'll read it to you, you must make your decision on the basis of testimony and other evidence presented here during the trial. You must not be influenced in any way by either sympathy or prejudice for or against the defendant or the Government. You must also follow the law as I explain it to you. Whether you agree with the law or not you must follow all of my instructions as a whole. You may not single out or disregard any of the Court's instructions on the law. Are you willing

10

to go back and deliberate and follow the Court's instructions on the law?

JUROR BONILLA: Yes, Your Honor.

R4 at 13-14.

The district court, far from admonishing a deadlocked jury to make further efforts to reach a verdict, was making inquiry in response to allegations that Juror Bonilla would not follow the law or the court's instructions. And, to the extent that the district court gave him any admonition, it was merely to follow the court's previous instructions, to base his decision on the testimony and evidence and not on sympathy or prejudice, and to follow the law, whether or not he agreed with it.

To the extent that the dialogue between the district court and Juror Bonilla contained supplemental instructions, we do not find any error. The applicable standard of review is whether, under the totality of the circumstances, the district court's instructions were coercive and whether this coercion "so infected the entire trial that the resulting conviction violated due process." See Brokemond, 959 F.2d at 208 (citation omitted).

Nothing in the district court's questioning and instructions suggested that a particular outcome was either desired or required, nor was it "inherently coercive." See Prosperi, 201 F.3d at 1341 (concluding that the trial court's instruction to

"please continue to deliberate" on certain counts was not coercive).  The district court, after questioning Juror Bonilla's willingness to apply the law in unbiased fashion, reiterated a portion of its original instructions to the entire jury.[5]  Far from coercing a guilty verdict, the district court specifically told him that he "must not be influenced in any way by either sympathy or prejudice for or against the defendant or the Government."  R4 at 14.  Therefore, we conclude that the district court's interview with Juror Bonilla did not violate Polar's Sixth Amendment right to a jury trial.

C. Upward Adjustment Based on Number of Involved Passports

Third, Polar argues that the district court erred in applying an upward adjustment based on its finding regarding the number of passports—27, in total—attributable to him.  The applicable guideline, § 2L2.1, provides a six-level increase if the offense involved 25 to 99 passports.  See U.S.S.G. 2L2.1(b)(2)(B).  Polar contends that the government failed to introduce sufficient evidence linking at least 25 passports to his offense.

---

[5]  To the extent that Polar, in his reply brief, argues that the coercive effect of the district court's supplemental instructions was evidenced by the jury subsequently returning a verdict "very quickly," neither his brief nor a review of the record indicates how much time elapsed between these instructions and the jury's ultimate verdict.  See United States v. Walker, 839 F.2d 1483, 1485 n.2 (11th Cir. 1988) (appellant bears the responsibility of ensuring that the record is complete).

"We review the district court's factual findings for clear error and we review its application of the law to those facts de novo." United States v. Singh, 335 F.3d 1321, 1323 (11th Cir. 2003) (considering challenge to the number of documents calculated for purposes of § 2L2.1(b)(2)). The government bears the burden of proving the applicability of guidelines that enhance a defendant's offense level. United States v. Cataldo, 171 F.3d 1316, 1321 (11th Cir. 1999). Similarly, when a defendant challenges a factual basis of his sentence, "the government has the burden of establishing the disputed fact by a preponderance of the evidence." United States v. Liss, 265 F.3d 1220, 1230 (11th Cir. 2001).

The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing. United States v. Saunders, 318 F.3d 1257, 1271 n.22 (11th Cir. 2003).

We find that the district court committed no error in attributing at least 25 passports to Polar. At sentencing, the government introduced the testimony of Agent Llorca, who testified that he had linked 26 passports containing counterfeit ADIT stamps to Polar's activities. Agent Llorca testified that, after a review of Polar's subpoenaed cellular phone records and Social Security applications containing the same or similar alien numbers, he had identified 26 aliens who

13

received counterfeit ADIT stamp marks from Polar—either from him directly or from him through Finbarb. When Agent Llorca interviewed these aliens and presented them with photo spread, they identified either Polar or Finbarb (who, according to evidence at trial, was supplied by Polar with counterfeit stamps) as the person who had supplied them with the counterfeit ADIT stamp marks. Agent Llorca also testified that, from these 26 aliens, he seized 16 passports containing counterfeit ADIT stamps and that laboratory analysis revealed that the ink on the ADIT stamp marks all came from the same source as the ink on the ADIT stamp that Polar supplied to Finbarb at one of their undercover meetings. The above testimony, together with the stamped passport that Polar sold to Finbarb in their undercover transaction, provided evidence of at least 27 passports containing counterfeit ADIT stamps that were linked to Polar.

Moreover, contrary to Polar's contention, the government did not need to produce all 27 passports counted for purposes of the § 2L2.1(b)(2)(B) adjustment. The testimony of Agent Llorca and Finbarb, along with the laboratory results, provided sufficiently reliable evidence. It is well established in this circuit that the sentencing court may rely on reliable hearsay, and Polar points us to nothing in the record indicating the evidence here lacked reliability. United States v. Zlatogur, 271 F.3d 1025, 1031 (11th Cir. 2001) (reliance on hearsay evidence at sentencing

14

is permissible "as long as the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence") (citation omitted), cert. denied, 535 U.S. 946, 122 S.Ct. 1338 (2002). Considering all of the evidence introduced, and giving due regard to the district court's credibility assessments, we conclude that the district court did not clearly err in attributing 27 illegally-stamped passports to Polar and in making the corresponding six-level upward adjustment.

D. Upward Adjustment for Facilitating of Non-Immigration Felony Offense

Fourth, and finally, Polar argues that the district court erred in applying a four-level upward adjustment, pursuant to § 2L2.1(b)(3), which requires such an adjustment "[i]f the defendant knew, believed, or had reason to believe that a passport or visa was to be used to facilitate the commission of a felony offense, *other than an offense involving the violation of the immigration laws*." U.S.S.G. § 2L2.1(b)(3) (emphasis added). At sentencing, the district court concluded that fraudulently obtaining a Social Security card, in violation of 42 U.S.C. § 408(a)(6)[6]—a felony that Polar knew or had reason to believe his counterfeit

---

[6] Section 408(a)(6) criminalizes the act of "willfully, knowingly, and with intent to deceive the Commissioner of Social Security as to his true identity (or the true identity of any other person) furnishes or causes to be furnished false information to the Commissioner of Social Security with respect to any information required." 42 U.S.C. § 408(6).

stamps would facilitate—was not an offense involving the violation of the immigration laws. Polar summarily argues that this offense should have been classified as a violation of "the immigration laws" for purposes of U.S.S.G. § 2L2.1(b)(3)

We review the district court's interpretation of the Sentencing Guidelines <u>de novo</u>. <u>United States v. Panfil</u>, 338 F.3d 1299, 1300 (11th Cir. 2003). Neither the United States Sentencing Commission nor this circuit has defined "immigration laws" for purposes of § 2L2 of the Sentencing Guidelines. Section 1101(a)(17) of Title 8 of the United States Code, however, defines "immigration laws" as "includ[ing] this chapter and all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion, or removal of aliens." 8 U.S.C. § 1101(a)(17). Under both this definition as well as the plain-language meaning of the phrase "immigration laws," it is difficult to understand how the offense of obtaining a SSN card by false pretenses can be characterized as a violation of immigration laws.

Social Security numbers are used for various non-immigration purposes; they are generally necessary to obtain lawful employment and to apply for government benefits. While aliens are undeniably among those most likely to fraudulently obtain a Social Security card, their possession of a card does not

16

affect their admission or exclusion, but rather a cluster of extra-immigration matters, such as employment and government benefits. The mere fact that SSNs may be of heightened importance to immigrants does not transform laws relating to their procurement and use into "immigration laws."

Although neither the parties nor our own research point us to any case law construing the outer limits of the term "immigration laws" as used in § 2L2.1(b)(3), the Seventh and the Ninth Circuits have had occasion to construe nearly identical language in U.S.S.G. § 2L1.2(b)(1), which calls for an enhancement if the defendant previously was deported subsequent to a felony conviction, "other than a felony involving violation of the immigration laws." See United States v. Pineda-Garcia, 164 F.3d 1233 (9th Cir. 1999); United States v. Sotelo-Carrillo, 46 F.3d 28 (7th Cir. 1995). Applying the definition of "immigration laws" found in § 1101(a)(17), both of these courts concluded that this definition encompassed only those laws "that criminalize conduct '*necessarily* committed in connection with the admission or exclusion of aliens.'" Pineda-Garcia, 164 F.3d at 1235 (quoting Sotelo-Carrillo, 46 F.3d at 29) (emphasis added in Pineda-Garcia). But see United States v. Lazaro-Guadarrama, 71 F.3d 1419, 1421 (8th Cir. 1995) (rejecting the Seventh and Ninth Circuits' analysis in favor of a broader construction of "immigration laws" for purposes of § 2L1.2(b)(1)).

17

We are persuaded by the Seventh and Ninth Circuits' construction of the term "immigration laws" and conclude that it is applicable for purposes of § 2L2.1(b)(3) as well. Even assuming that the SSN cards that Polar's counterfeit ADIT stamps helped various aliens to obtain were used to perpetuate immigration fraud, the fraudulent obtaining of the SSN cards itself was not "*necessarily* committed in connection with the admission or exclusion of aliens." Accordingly, Polar's crime facilitated a felony offense "other than an offense involving the violation of the immigration laws," and the district court's four-level enhancement was appropriate.

## III. CONCLUSION

For the foregoing reasons, we find no error in Polar's conviction and sentence. Accordingly, the judgment of the district court is

**AFFIRMED.**