[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13966
Non-Argument Calendar
_____

D.C. Docket No. 0:15-cr-60029-WJZ-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANDREW BEUSCHEL,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 17, 2016)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

After a jury trial, Andrew Beuschel was convicted of conspiring to traffic and trafficking in counterfeit Viagra tablets. On appeal, he challenges the sufficiency of the evidence to support his convictions, the district court's admission of evidence under Rule 404(b), Fed. R. Evid., and the court's calculation of his guideline range—specifically the part of that range based on the number of counterfeit tablets for which he was held responsible and the value of the tablets. The government confesses error on a related sentencing issue. After careful review, we affirm Beuschel's convictions and his sentencing challenges, but we vacate and remand for resentencing pursuant to the government's confession of error.

## I.  BACKGROUND

### A.    *Procedural History*

A federal grand jury returned an indictment charging Beuschel with conspiracy to traffic in a counterfeit drug in or around April or May 2014, and trafficking in a counterfeit drug in June 2014, all in violation of 18 U.S.C. § 2320(a)(4) and (b)(3). Beuschel pled not guilty and proceeded to trial.

Before trial, the government noticed its intent to admit evidence under Rule 404(b) of the Federal Rules of Evidence. This evidence consisted of a chain of emails from January and February 2013 between Beuschel and another person regarding a prior sale of purported Viagra. In the government's view, the emails

were relevant to show Beuschel's knowledge of the counterfeit nature of the Viagra. Over Beuschel's objections, the district court found the evidence admissible to show knowledge.

At trial, the district court denied Beuschel's motions for judgment of acquittal at the close of the government's case and at the close of the evidence. A jury returned a verdict finding Beuschel guilty on both counts charged.

The district court sentenced Beuschel to concurrent terms of 63 months of imprisonment, to be followed by concurrent three-year terms of supervised release.

## B.    Trial Evidence[1]

This case is about a package of counterfeit Viagra that Beuschel shipped from New Jersey to a cooperating source ("CS") in South Florida in June 2014. The CS was working with the United States Food and Drug Administration ("FDA"). Beuschel never disputed that he sent the package, but he claimed to believe that the Viagra was authentic and that he was simply returning what had been mistakenly sent to him by Frank Fiore, a former business partner.

The June 2014 shipment developed out of meeting a couple of months earlier between the CS, an undercover agent, and Fiore, who was under investigation for trafficking in counterfeit drugs. At this April 2014 meeting, the CS asked for and received Fiore's blessing to do business with Beuschel. Fiore

---

[1] We present the evidence in the light most favorable to the jury's verdict. *United States v. Rutgerson*, 822 F.3d 1223, 1232 (11th Cir. 2016).

and Beuschel had done business together before, but things had turned bad between them. Fiore believed that Beuschel had once cheated him out of money, and Beuschel claimed that Fiore and the CS still owed him over $100,000.

On May 7, 2014, about two weeks after the April meeting, Beuschel sent an email to Fiore with the subject line, "candy: skittles 2710 boxes $6775 if more is needed i'm sure we can accommodate your request." Beuschel later confirmed to law enforcement that "skittles" was a reference to Viagra. Fiore forwarded the email to the CS, who, in turn, forwarded the email to Maximillian Trimm, a Special Agent with the FDA. At Agent Trimm's direction, the CS wired about half the funds, which the CS received from the government, to Beuschel.

Once he received the money from the CS, Beuschel notified Fiore by email on May 26 that he would be coming down from New Jersey, where he lived, to meet them in South Florida. Fiore, who forwarded the email to the CS, told Beuschel that Fiore was not necessary for the meeting. Beuschel responded that he wanted Fiore there to discuss "payments received and when we are getting the balance."

Beuschel traveled to South Florida and met with the CS on May 30, 2014. Before the meeting, the CS notified the FDA, which provided him a recording device to use during the meeting. The jury heard the recording at trial.

4

During the recorded conversation, Beuschel explained to the CS that he did not bring the "stuff that I have for you" because he did not think he could carry it on the plane, and he also did not mail it because he was not sure if he could. He indicated that he planned to drive down the next week with some equipment, so he was "gonna stick it in with the tools." Beuschel stated that he had 2,800 "pieces," or boxes, that each box contained four tablets, and that he paid $2 per tablet.

Beuschel also discussed other goods he could provide the CS, and he indicated that he could create custom labeling and packaging for drugs. He stated, "you give me a label that you want to put it under, whatever the name is that you want to put it under, we can make it whatever you want"; and "I can make a bilingual box so they could read it as both."

Beuschel went on to advise the CS that he could "get Cialis or Viagra any day." Beuschel stated, "Like if you told me, I need ten thousand boxes, that's forty thousand pills. . . . I can have them to you in probably two weeks." Beuschel asked if the CS wanted "orange" (Cialis, a mustard-yellow tablet) or "blue" (Viagra, a blue tablet), and the CS said both. Beuschel responded, "I'll make the phone call to the guy. He's in Brooklyn. I'll make the phone call to the guy that manufactures them . . . ." Beuschel said he would introduce the CS to the "guy" in Brooklyn. The CS assured Beuschel that he could send the Viagra through UPS without issue.

5

On June 17, 2014, Beuschel shipped a package to the CS from a UPS store in New Jersey. Beuschel signed the shipping forms in the name of "Frank Fiore" and gave a return address in Boca Raton, Florida. In an email, Beuschel told the CS that "Frank Fiore" had sent the package. The CS received the package and delivered it to Agent Trimm.

The package contained 681 boxes that were labeled "Viagra." Each box contained a "blister pack" of four tablets that appeared to be 100-mg doses of Viagra. The word "Pfizer" and its logo were on the outside of the boxes and on the blister packs and the words "Pfizer" and "VGR" were embossed directly on the tablets. The boxes and blister packs were labeled with an April 2014 expiration date. "Pfizer," its logo, "Viagra," and "VGR" were all trademarks of Pfizer, Inc., in use at the time of Beuschel's conduct.

The tablets were tested and determined to be counterfeit. While the false tablets had the same markings, shape, and general color as real Viagra, they were larger and "noticeably darker" than real Viagra. In addition, a chemical analysis revealed that the false tablets contained sildenafil citrate, the active ingredient in Viagra, but at around half the potency of real Viagra. The packaging was likewise determined to be counterfeit. The packaging used real but outdated or inconsistent artwork and security features and an incorrect bar code, among other features. The

wholesale price of Viagra was around $38 for a 100-mg tablet as of June 1, 2014, well above the $2 per tablet Beuschel paid.

On July 6, 2014, about two weeks after the shipment, Beuschel emailed the CS asking for payment for the "candy." He stated, "payments owed next week $10,000 past debt and $3,000 for candy, please make deposit Monday, July 7th!!" The CS responded that the "candy had all expired dates." Beuschel replied, "It's all good take them out of the box that's the only dating." In a separate email, Beuschel told the CS that he would put the CS in touch with "Anderson," the guy in Brooklyn, "directly on the candy as stated." On July 21, 2014, Beuschel again stated that the CS owed $3,000 and that he wanted to introduce the CS to Anderson "for additional inventory and stick sales."

After Beuschel's name appeared in a criminal complaint against Fiore, Beuschel, through counsel, requested a meeting with prosecutors. During the interview, Beuschel explained that he was in the business of "opportunity buys," meaning that he would purchase outdated or about-to-expire products at a discount and sell them for profit. He also stated that he manufactured dietary or nutritional supplements, including "Clavine," a natural supplement used to treat erectile dysfunction.

Beuschel explained during the interview how he came to send the package of Viagra to the CS in June 2014. According to Beuschel, he had asked Fiore at

some point after 2012 to return some business proposals that Fiore had in his possession. Fiore sent him two boxes. Beuschel did not look in the boxes until May 2014, when Fiore called to tell him that one contained "product" by mistake. At that point, Beuschel looked in the box and saw that it contained Viagra. He agreed to send the box to the CS in exchange for approximately $6,000, as partial payment for the more than $160,000 they owed him as a result of two failed business deals. He shipped the package to the CS under Fiore's name because it belonged to Fiore.

Beuschel also claimed in the interview that he had never dealt in pharmaceuticals before. After Agent Trimm testified about that statement at trial, the government admitted, through Rule 404(b), Fed. R. Evid., a chain of emails between Beuschel and Fiore in 2013 discussing a sale of "skittles" and "m&ms." In the emails, Beuschel stated that he had "the allocation ready based on your say so," to which Fiore responded, "so far 5000 blue skittles and most likely the orange as well so I will take the full skittles order but let me get payment on thurs/fri."

## C.    *Sentencing*

### 1.    Relevant Conduct

Before sentencing, a probation officer prepared Beuschel's revised presentence investigation report ("PSR"). The PSR included as "relevant conduct," *see* U.S.S.G. § 1B1.3, facts from 2012 arising out of a police

8

investigation into Walter Jacovcic in Woodbridge Township, New Jersey. Following Jacovcic's arrest, officers searched his phone and found text messages between Jacovcic and Beuschel discussing the purchase of "blue" and "orange" "candies."   During an interview with officers about the texts in April 2013, Beuschel confirmed that, in November or December 2012, he had obtained Viagra and Cialis (the blue and orange candies) from Jacovcic to sell or give to others, because "people don't take anything that isn't real so they are looking at it to make sure they are getting something real."  Beuschel claimed to officers that he bought 140 tablets each of Viagra and Cialis for $2 per tablet, but the texts indicated that Beuschel had bought 140 "four-packs," or 560 tablets, each.  Samples of Viagra and Cialis seized from Jacovcic in December 2012 were found to be counterfeit.[2]

The PSR also included as relevant conduct Beuschel's offer to sell Viagra and Cialis to Fiore in early 2013, as reflected in the emails the government introduced at trial under Rule 404(b).  The PSR found that Beuschel offered to sell 10,000 tablets each of Viagra and Cialis.

### 2.    PSR's Guideline Calculations

In criminal copyright-infringement cases, the base offense level is 8.  *See* U.S.S.G.  § 2B5.3(a).    Then, the offense level is increased based on the "infringement amount," which, in cases where the infringement amount exceeds

---

[2] The PSR states that the samples of Viagra and Cialis were seized from Jacovcic in December 2015, but that appears to be a clerical error and instead should be December 2012.

$5,000, is determined by reference to the loss table for fraud and theft offenses found in § 2B1.1. *Id.* § 2B5.3(b)(1).

Beuschel's PSR calculated a total infringement amount of $621,067.27, based on the following conduct: (1) 2,724 tablets he sold to the CS in June 2014; (2) 20,000 tablets he offered to sell to Fiore in early 2013; and (3) 1,120 tablets he bought from Jacovcic in December 2012. The PSR multiplied the number of tablets by the "wholesale acquisition cost" of each tablet at the relevant time to determine the infringement amount. The "wholesale acquisition cost," the PSR states, is the price at which the manufacturer sells the drugs to wholesale distributors. Based on the infringement amount, the PSR applied a 14-level increase to the offense level. *See* U.S.S.G. § 2B1.1(b)(1)(H).

With two additional two-level enhancements, the PSR assigned Beuschel a total offense level of 26. Beuschel had zero criminal-history points, placing him in criminal-history category I. This established a guideline sentencing range of 63 to 78 months of imprisonment.

3.    Beuschel's Objections to the PSR and the Government's Position

Among other objections to the PSR, Beuschel contended that the infringement amount should be zero. He argued that the tablets he shipped to the CS had no value because they were expired, and that the Jacovcic and Fiore transactions should be excluded as relevant conduct because the evidence was

10

insufficient to show that he knew the tablets were counterfeit.  He also asserted that there was no evidence that the deal with Fiore had been consummated.

While the government agreed that expired Viagra has no retail value, it argued that Beuschel's position did not make sense as an interpretation of the guideline.  Under § 2B5.3, the government noted, the infringement amount is "the retail value of the infringed item, multiplied by the number of infringing items," in cases where the infringing item is, or appears to a reasonably informed purchaser to be, identical or substantially equivalent to the infringed item.  Reasoning that the "infringed item" is "the item that the defendant is trying to mimic," the government asserted that "the infringed item in this case is legitimate salable Viagra," not expired Viagra.  The government asserted that Beuschel's comments after the CS complained about the expiration dates—telling the CS to take the tablets out of the packaging—confirmed that he was "attempting to infringe on Viagra that still has its retail value."  Thus, in the government's view, the trial evidence established that Beuschel was attempting to sell counterfeit Viagra that, to a reasonably informed purchaser, could easily be mistaken for unexpired Viagra, so he should be accountable for those tablets.

As for Beuschel's other objections, the government responded that there was sufficient evidence to uphold the PSR's inclusion of Beuschel's conduct in 2012 and 2013 as relevant conduct.  The government cited, among other things,

11

Beuschel's use of the same coded language in these transactions as in the offense of conviction as well as the similar price well below wholesale.

### 4.    District Court's Rulings

The district court overruled Beuschel's objections to the infringement amount and upheld the 14-level enhancement. The court determined that the counterfeit Viagra Beuschel sent to the CS in 2014 had value despite being "expired," and that Beuschel knew that the "Viagra" and "Cialis" involved in the 2012 Jacovcic transaction and the 2013 Fiore transaction were counterfeit. As additional support for these findings, the court adopted the written statements of the prosecutor and the probation officer in response to Beuschel's objections, which were consistent with the government's arguments at sentencing.

The district court denied Beuschel's remaining objections and sustained the government's objection to the application of a two-level enhancement under U.S.S.G. § 2B5.3(b)(6)(A). Beuschel's base total offense level was reduced to 24, establishing a guideline range of 51 to 63 months. The district court sentenced Beuschel to two concurrent terms of 63 months of imprisonment. Beuschel now appeals.

## II.  SUFFICIENCY OF THE EVIDENCE

Beuschel first challenges the sufficiency of the evidence to support his convictions, an issue we review *de novo*. *United States v. Rutgerson*, 822 F.3d

12

1223, 1231 (11th Cir. 2016). "We are required to affirm [a] conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted) (emphasis in original). So, to prevail, the defendant must do more than put forth a reasonable hypothesis of innocence.[3] *United States v. Bowers*, 811 F.3d 412, 424 (11th Cir.), *cert. denied*, 136 S. Ct. 2401 (2016).

When reviewing for evidentiary sufficiency, we construe the evidence and draw all reasonable inferences and credibility choices in favor of the jury's verdict. *Rutgerson*, 822 F.3d at 1232. No distinction is made between the weight given to either direct or circumstantial evidence. *Bowers*, 811 F.3d at 424. Guilty knowledge—here, knowledge of the counterfeit nature of the Viagra—may, and often must, be inferred from the "surrounding circumstances." *United States v. Perez*, 698 F.2d 1168, 1170 (11th Cir. 1983). But where the government relies on circumstantial evidence, the jury's verdict must be supported by reasonable inferences and not mere speculation. *Bowers*, 811 F.3d at 424.

## A.   Trafficking in a Counterfeit Drug

---

[3] Beuschel cites the former Fifth Circuit's decision in *Thurmond v. United* States, 377 F.2d 448, 450–51 (5th Cir. 1967), for the proposition that "an appellate court is to affirm a conviction challenged on the basis of the insufficiency of the evidence only if this Court can conclude that a jury could reasonably find that the evidence excluded every reasonable hypothesis except that of guilt." However, that stricter standard of review is no longer good law. *See United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (*en banc*); *United States v. Bent*, 707 F.2d 1190, 1193 (11th Cir. 1983) (decisions rendered by Unit B panels of the former Fifth Circuit are binding precedent on this Court).

Under 18 U.S.C. § 2320(a)(4), it is illegal for someone to intentionally "traffic[] in a drug and knowingly use[] a counterfeit mark on or in connection with such drug."  18 U.S.C. § 2320(a)(4); *see* 18 U.S.C. § 2320(f)(1), (5)–(6) (defining the terms "counterfeit mark," "traffic" and "drug").  There is no dispute in this case that counterfeit marks—the various trademarks held by Pfizer for "Pfizer," its logo, "Viagra," and "VGR"—were used in connection with trafficking a drug.  The only issue is whether Beuschel knew that the Viagra was counterfeit.

Here, sufficient evidence supports Beuschel's conviction for the substantive offense of trafficking in a counterfeit drug.  Although Beuschel never himself identified the Viagra as "bogus" or "counterfeit," the government presented ample circumstantial evidence from which a reasonable jury could have inferred that Beuschel knew that the Viagra was counterfeit.  This evidence included, most notably, the recorded conversation between Beuschel and the CS in May 2014, in which Beuschel described his source of Viagra tablets as a guy in Brooklyn who "manufactures them."  In addition, Beuschel told the CS that he could get him 40,000 tablets in two weeks, without suggesting that the two-week time frame was contingent on, for example, a shipment of outdated but authentic Viagra or Cialis coming in.  Beuschel also paid $2 per tablet, far below the wholesale price of around $38 per tablet at the time.  All of these facts indicate that Beuschel knew that the tablets were not legitimate Viagra manufactured by Pfizer.  *See United*

14

*States v. Zayyad*, 741 F.3d 452, 462–63 (4th Cir. 2014) (evidence that pills "came at a very low price, in enormous volumes, from sources that one would not normally expect to have legitimate pills . . . indicate that the pills were illegitimate").

Other aspects of the "surrounding circumstances" provide additional evidence of Beuschel's guilty knowledge. *See Perez*, 698 F.2d at 1170. For example, Beuschel took efforts to conceal his behavior, which, in turn, suggests knowledge of wrongdoing. *See Zayyad*, 741 F.3d at 463 (concealment implies consciousness of guilt). He used coded language in emails, referring to the Viagra as "skittles" or "candy"; he expressed reluctance about sending the tablets by mail for fear of detection; and he initially planned to transport the tablets to South Florida by hiding them in some tools on a truck, before the CS reassured him that he would have no issues sending the tablets through UPS. Beuschel also falsely told prosecutors that he had never dealt in pharmaceuticals before, when prior emails showed that Beuschel previously had offered to sell Fiore "skittles." These additional facts further support an inference that Beuschel knew that the Viagra tablets were counterfeit.

It is not enough for Beuschel to offer a reasonable hypothesis of innocence, assuming he has shown even that much. *See Bowers*, 811 F.3d at 424. His hypothesis of innocence—that he was simply returning what Fiore sent him

15

mistakenly—was presented to and rejected by the jury, and it was inconsistent with other evidence presented at trial, including the May 2014 recorded conversation and his emails to Fiore and the CS. In addition, the government did not need to present direct proof that the terms "candy" and "skittles" referred to counterfeit Viagra. The use of coded language was just one piece of the surrounding circumstances that supported an inference of guilty knowledge. Viewing the evidence as a whole, a reasonable jury could have inferred from the circumstantial evidence that Beuschel knew the counterfeit nature of the Viagra. *See Rutgerson*, 822 F.3d at 1231–32; *Bowers*, 811 F.3d at 424.

## B.    *Conspiring to Traffic in a Counterfeit Drug*

Under 18 U.S.C. § 2320(a), it is unlawful to "attempt[] or conspire[] to violate" any of the four substantive offenses listed in subsection (a), including trafficking in a counterfeit drug. In general, to sustain a conviction for conspiracy, the government must prove the following: (1) an agreement existed between two or more persons to achieve an unlawful objective; (2) the defendant knew the essential objective of the conspiracy and voluntarily agreed to join it; and (3) an overt act occurred in furtherance of the conspiracy. *United States v. Toll*, 804 F.3d 1344, 1355 (11th Cir. 2015); *United States v. Guerra*, 293 F.3d 1279, 1285 (11th

16

Cir. 2002).[4]   The existence of a conspiracy may be proved by circumstantial evidence and may be inferred from concert of action.  *Guerra*, 293 F.3d at 1285. An individual can be convicted of conspiracy with unknown persons referred to in the indictment, even if those individuals are not brought to trial.  *United States v. Figueroa*, 720 F.2d 1239, 1245 n.8 (11th Cir. 1983).

Beuschel argues that his conspiracy conviction cannot stand because the only person he could have conspired with was Frank Fiore, given that the CS was working with the government, and no evidence shows that he and Fiore agreed to traffic in counterfeit Viagra.  The government responds that the evidence shows that Beuschel and Fiore conspired to sell counterfeit Viagra to the CS.

While the evidence shows that Fiore may have been involved in an agreement to purchase counterfeit Viagra from Beuschel, there is little to show the presence of "an agreement with the same joint criminal objective—here the joint objective of [trafficking in] drugs."  *See United States v. Dekle*, 165 F.3d 826, 829 (11th Cir. 1999) ("This joint objective is missing where the conspiracy is based on an agreement between a buyer and a seller for the sale of drugs.").  Arguably a reasonable jury could have inferred that Fiore, along with the CS, bought the counterfeit Viagra for the purpose of re-sale, which may support the existence of a conspiracy, but other than the emails from early 2013, the government did not

---

[4] The government asserts that evidence of an overt act is not required to prove a conspiracy under 18 U.S.C. § 2320(a), but we need not and do not reach this issue.

17

present evidence to establish the existence of a continuing relationship between Fiore and Beuschel or to show what Fiore planned to do with drugs. *See Guerra*, 293 F.3d at 1286 (stating that "the buyer-seller rule is inapposite to [a] commercial supplier-dealer relationship"); *see also United States v. Johnson*, 889 F.2d 1032, 1035–36 (11th Cir. 1989) ("In the case of a purchaser of narcotics, we have held that agreement may be inferred when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to the purchaser.").

Nevertheless, the government presented sufficient evidence for a reasonable jury to conclude that Beuschel conspired with Anderson, the "guy" in Brooklyn, to traffic in counterfeit Viagra. Such a conspiratorial agreement may be inferred from Beuschel's comments during the May 2014 recorded conversation with the CS, which reflect that Beuschel obtained the counterfeit Viagra tablets from Anderson, who manufactured them, and then sold the tablets to others, such as the CS. *See Figueroa*, 720 F.2d at 1244–45 ("Vega's admission that he obtained the drugs from an unnamed Colombian and that he was engaged in drug trade warrants an inference of an agreement to 'possess [the drugs] with intent to distribute' so as to sustain the conviction for conspiracy."). The existence of a "commercial supplier-dealer relationship" between Beuschel and Anderson is also supported by Beuschel's statements that he could get 40,000 tablets from Anderson in two weeks and that he would put the CS directly in touch with Anderson. *See Guerra*,

18

293 F.3d at 1286.  The fact that Anderson was not indicted or brought to trial does not preclude a jury from concluding, consistent with the indictment, that Beuschel conspired with others "unknown to the grand jury to intentionally traffic in a counterfeit drug."  *See Figueroa*, 720 F.2d at 1245 n.8.

Because sufficient evidence supports both of Beuschel's convictions, we affirm the district court's denials of his motions for judgment of acquittal.[5]

## III.  RULE 404(b) EVIDENCE

Beuschel next challenges the district court's admission under Rule 404(b), Fed. R. Evid., of a chain of emails wherein Beuschel and Fiore discussed a sale of "skittles," or Viagra, in early 2013.  We review a district court's admission of evidence under Rule 404(b) for an abuse of discretion.  *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992) (*en banc*).

Rule 404(b) prohibits the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b).  Other-crimes evidence may be admissible, however, for other purposes, such as to

---

[5] In his briefs, Beuschel makes several passing references to the alleged improper admission of hearsay testimony from Fiore and the CS, his inability to confront these witnesses against him, and his trial counsel's failure to offer a "single objection" to the problematic testimony.  As for the evidentiary issues, they were not raised below and were not properly raised on appeal.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–82 (11th Cir. 2014) (passing references to an issue are not sufficient to raise the issue on appeal).  And Beuschel's frustration with trial counsel is more appropriate for a motion to vacate under 28 U.S.C. § 2255.

prove intent, knowledge, or absence of mistake or accident. *Id.* "Rule 404(b) is one of inclusion which allows extrinsic evidence unless it tends to prove only criminal propensity." *United States v. Sanders*, 668 F.3d 1298, 1314 (11th Cir. 2012) (internal quotation marks omitted).

We use a three-part test to determine whether evidence is admissible under Rule 404(b): (1) the evidence must be relevant to an issue other than character; (2) sufficient proof must exist for a jury to find that the defendant committed the extrinsic act; and (3) the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must otherwise satisfy Rule 403. *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003). Limiting instructions to the jury may "cure[] any possible unfair prejudice posed by the 404(b) evidence." *United States v. Brown*, 665 F.3d 1239, 1248 (11th Cir. 2011) (alteration adopted) (internal quotation marks omitted).

Here, the district court did not abuse its discretion by admitting the earlier emails. First, the emails were relevant to something outside of Beuschel's character, namely, his knowledge that the Viagra tablets were counterfeit, which he disputed. The emails were relevant to the government's showing that Beuschel consistently used coded language in circumstances where there was a possibility that the communication might be intercepted or read by someone else, such as in emails, but not in an ostensibly private setting, such as the meeting with the CS,

20

during which Beuschel openly referred to Viagra and Cialis. In addition, Beuschel's statement that the "skittles" were "made" for him was relevant to show his knowledge of counterfeit Viagra.

Second, the government presented sufficient proof that Beuschel sent the emails. Beuschel does not challenge this point.

Third, the probative value of the evidence was not substantially outweighed by its undue prejudice. Because Beuschel maintained that he believed the Viagra was authentic, the emails were probative of Beuschel's guilty knowledge. Beuschel has not provided any persuasive explanation of how he was unfairly prejudiced by the admission of the emails. Indeed, as he points out, the emails do not clearly involve the sale of counterfeit Viagra, and they contain the same coded language already before the jury through other evidence. In any case, the district court gave the jury a limiting instruction, which reduced the risk of any prejudice posed by the Rule 404(b) evidence. *See Brown*, 665 F.3d at 1248.

In sum, the district court did not abuse its discretion by admitting evidence of the emails between Beuschel and Fiore from early 2013.

## IV.  SENTENCING GUIDELINES

Finally, Beuschel challenges the court's calculation of the "infringement amount" under U.S.S.G. § 2B5.3. He contests both the number of counterfeit tablets for which he was held responsible and the value attributed to those tablets.

21

With respect to Sentencing Guidelines issues, we review purely legal questions *de novo*, a district court's factual findings for clear error, and, in most cases, a district court's application of the guidelines to the facts with due deference. *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010). We review the application of the relevant-conduct guideline for clear error. *United States v. Siegelman*, 786 F.3d 1322, 1332 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 798 (2016). We broadly interpret the provisions of the relevant-conduct guideline. *United States v. Behr*, 93 F.3d 764, 765 (11th Cir. 1996).

At sentencing, the district court is entitled to rely on undisputed factual statements in the PSR. *United States v. Beckles*, 565 F.3d 832, 844 (11th Cir. 2009) ("Facts contained in a [PSR] are undisputed and deemed to have been admitted unless a party objects to them before the sentencing court with specificity and clarity." (internal quotation marks omitted)). Further, the court may base its factual findings on evidence heard during trial. *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004).

A defendant who is convicted of violating 18 U.S.C. § 2320 is sentenced pursuant U.S.S.G. § 2B5.3, which provides for a base offense level of 8. Then, the offense level is increased based on the "infringement amount." U.S.S.G. § 2B5.3(b)(1). If the infringement amount exceeds $5,000, the increase is determined by the table in § 2B1.1. *Id.*

22

In broad terms, the infringement amount is calculated by multiplying the (1) number of "infringing items" by (2) the retail value of either (a) the "infringed item" or (b) the infringing item, depending on the circumstances. *See* U.S.S.G. § 2B5.3 cmt. n.2. The infringed item means the copyrighted item "with respect to which the crime against intellectual property was committed," while the infringing item means "the item that violates the copyright . . . laws." *Id.* § 2B5.3 cmt. n.1. So, here, the counterfeit drugs are the infringing items. We address the number of infringing items first, and the question of value second.

## A.    *Number of Infringing Items*

The district court based the number of infringing items on the following conduct: (1) 2,724 counterfeit Viagra tablets Beuschel shipped to the CS in June 2014; (2) 10,000 counterfeit Viagra tablets and 10,000 counterfeit Cialis tablets he offered to sell to Fiore in early 2013; and (3) 560 counterfeit Viagra tablets and 560 counterfeit Cialis tablets he bought from Jacovcic in December 2012. Beuschel contends that the 2012 and 2013 transactions should not have been included as relevant conduct.

Sentencing courts must consider all relevant conduct, as defined in § 1B1.3, when calculating a defendant's guideline range. *Siegelman*, 786 F.3d at 1332. Under § 1B1.3, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by

23

the defendant" "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(1), (2); *see also* U.S.S.G. § 1B1.3 cmt. n.3; U.S.S.G. § 1B1.3 cmt. n.9 (defining "common scheme or plan" and "same course of conduct").[6] Relevant conduct may include both uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence. *Siegelman*, 786 F.3d at 1332.

Although Beuschel's arguments on appeal are less than precise, he does not appear to dispute that the relevant conduct for which he was held accountable was part of the same course of conduct or common scheme or plan as the offense of conviction.[7] Instead, Beuschel argues that the evidence was not sufficient to show that the tablets at issue were counterfeit or that he knew they were counterfeit.

Here, the district court did not clearly err in determining the number of infringing items. First, sufficient evidence supports the court's inclusion of the 2012 transaction involving Jacovcic. According to undisputed statements in the PSR, Beuschel used the same coded language to refer to the Viagra and Cialis tablets ("blue and orange candies" and "skittles"), he bought the tablets for a similar price as the offense of conviction, which was well below wholesale, and

---

[6] The "same course of conduct or common scheme or plan" requirement applies when the offenses must be grouped under U.S.S.G. § 3D1.2(d). That appears to be the case here.

[7] In his reply brief, Beuschel does raise the issue of whether the 2012 and 2013 transactions were sufficiently close in time to qualify as part of the "same course of conduct." However, we generally do not consider issues raised for the first time in a reply brief. *United States v. Britt*, 437 F.3d 1103, 1104–05 (11th Cir. 2006).

24

samples of Viagra and Cialis seized from Jacovcic in December 2012, shortly after Beuschel purchased the "four-packs" from him, were tested and found to be counterfeit. Based on these facts and their similarity to the trial evidence, the district court did not clearly err in finding that Beuschel knowingly trafficked counterfeit Viagra and Cialis in 2012.

Second, the district court appropriately held Beuschel responsible for a total of 1,120 tablets based on the 2012 transaction. Although Beuschel stated to the police that he bought 140 tablets each of Viagra and Cialis, his text messages with Jacovcic indicated that he purchased 140 "four-packs" of each. In addition, Beuschel did not object to the PSR's statement that he bought a total of 1,120 tablets, so the court properly relied on that fact.

Third, sufficient evidence supports the district court's inclusion of the 2013 transaction involving Fiore. Again, this transaction involved the same use of coded language and the same low price per tablet. In addition, Beuschel stated that the tablets were "made for" him, indicating his knowledge that the tablets were not legitimate. Thus, the district court did not err in finding that Beuschel knew the tablets were counterfeit.

Beuschel's reliance on *Guerra* is misplaced. In *Guerra*, we agreed with the Seventh Circuit's holding that "the number of infringing items should correspond to the number of completed or nearly completed counterfeit goods." *Guerra*, 293

F.3d at 1293.  On that basis, we held that the district court erred in basing the number of infringing items on the number of cigar labels seized, when the counterfeit good was a completed cigar and the court did not make any "determination as to the extent to which defendants had a reasonable likelihood of actually completing the goods." *Id.* at 1293–94.  Here, however, the emails reflect that Beuschel had "the allocation ready," suggesting that the counterfeit tablets were in existence and ready for shipment.  Thus, they were properly considered as infringing items.

Finally, the government states that Beuschel was improperly held accountable for a total of 20,000 tablets, instead of 10,000 tablets, based on the 2013 transaction.  According to the government, this error improperly increased his guideline range by two levels.  We accept the government's confession of error and vacate and remand for sentencing to correct the error.

### B.    *Value of Infringed Items*

The relevant "retail value," for purposes of determining the infringement amount, is based either on the infringed item or the infringing item, depending on the circumstances.  According to the commentary to § 2B5.3, courts should use the retail value of the ***infringed*** item if the case involves, among other situations listed in the commentary, an infringing item that "is, or appears to a reasonably informed purchaser to be, identical or substantially equivalent to the infringed item."

U.S.S.G. § 2B5.3 cmt. n.2(A)(i). In a case not covered by one of the commentary's listed situations, courts should use the retail value of the ***infringing*** item. *Id.* § 2B5.3 cmt. n.2(B). "Retail value" is defined as "the retail price of that item in the market in which it is sold." *Id.* § 2B5.3 cmt. n.2(C). In general, according to the commentary to § 2B5.3, "the sentences for defendants convicted of intellectual property offenses should reflect the nature and magnitude of the pecuniary harm caused by their crimes." *Id.* § 2B5.3 cmt. backg'd.

Here, the district court adopted the government's position that the "infringed item" in the offense of conviction was authentic, unexpired Viagra, and that the counterfeit Viagra "is, or appears to a reasonably informed purchaser to be, identical or substantially equivalent to the infringed item." In support of its position, the government noted that the expiration date was difficult to see; that Beuschel directed the CS to remove the packaging, which showed that Beuschel was attempting to infringe on Viagra that still had retail value; and that the trial evidence established a substantial equivalence between the infringed and infringing items. Beuschel does not challenge any of these findings as clearly erroneous. *See United States v. Lozano*, 490 F.3d 1317, 1322 (11th Cir. 2007) (reviewing the court's determination of the appropriate retail value for clear error).

In light of these uncontested findings, the district court properly based the retail value on authentic, unexpired Viagra. *See* U.S.S.G. § 2B5.3 cmt. n.2(A)(i).

27

Beuschel asserts that "[t]he Government never produced any evidence of what the price of an expired Viagra pill was in the marketplace when it was sold and without this evidence, the Trial Court could not factually conclude the proper infringement value."  But the "price of an expired Viagra pill" was not relevant to the court's infringement calculations, because the court determined that the "infringed item" was authentic, unexpired Viagra.  Overall, we are not persuaded that the court clearly erred in determining the values of the drugs at issue.[8]

## V.  CONCLUSION

In sum, we hold that sufficient evidence supports Beuschel's convictions for trafficking in counterfeit drugs and conspiring to traffic in counterfeit drugs and that the court did not abuse its discretion in admitting evidence under Rule 404(b).  We therefore affirm Beuschel's convictions.  We also conclude that Beuschel has not shown that the district court erred in calculating the infringement amount, and we affirm on these issues as well.  Pursuant to the government's confession of error, however, we vacate and remand for resentencing to correct the limited error identified by the government.

**AFFIRMED in part; VACATED and REMANDED in part.**

---

[8] In passing, Beuschel asserts that no evidence established the value of Cialis, but the PSR contains undisputed statements regarding the value of each of the drugs at issue.

28