[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14323

_____

D.C. Docket No. 1:18-cr-20748-RAR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LESSIE EARL PROCTOR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 16, 2021)

Before JILL PRYOR, NEWSOM and MARCUS, Circuit Judges.

PER CURIAM:

This is a direct appeal from a multi-count criminal conviction and sentence. Lessie Earl Proctor and a codefendant, Anna Kay Coenen, conspired to and did commit several armed robberies in a two-week spree that spanned several states. The spree ended in dramatic fashion when the stolen car Proctor and Coenen were driving crashed; Proctor fled and Coenen, seriously injured, was arrested and implicated Proctor.

Proctor and Coenen were charged with conspiracy to commit Hobbs Act robbery, two counts of Hobbs Act robbery, and two counts of brandishing a firearm during the commission of the robberies. Importantly, there was evidence that Proctor and Coenen committed more than just the two robberies charged in the indictment: they were implicated in five, plus a carjacking. Coenen pled guilty to the conspiracy and Hobbs Act robbery charges only; she testified against Proctor at his trial. Proctor was convicted of all counts and sentenced to serve 461 months' imprisonment.

After careful review, and with the benefit of oral argument, we affirm Proctor's convictions and sentence.

## I.

Here we recount only the facts necessary to explain our decision. A grand jury indicted Proctor and Coenen on one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); two counts of Hobbs Act

robbery, in violation of 18 U.S.C. § 1951(a) (Counts 2 and 4); and two counts of brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Counts 3 and 5).  Coenen pled guilty to Counts 1, 2, and 4, and testified against Proctor, who pled not guilty and proceeded to a jury trial.

These are the essential facts elicited at trial.  Proctor and Coenen began a spree of robberies when they carjacked and robbed an elderly woman in Pensacola. The next day they drove in the stolen car, a red Hyundai Elantra, to Miami, where they robbed a Cricket Wireless phone store.  Proctor brandished a firearm there. The Cricket Wireless robbery formed the basis for Count 2, Hobbs Act robbery, and Count 3, brandishing a firearm in furtherance of a crime of violence.  The next day, the pair drove to Hialeah and robbed a Subway restaurant.  Proctor pulled his gun on a store employee and told her to open her cash register.  The Subway robbery formed the basis for Count 4, Hobbs Act robbery, and Count 5, brandishing a firearm in furtherance of a crime of violence.

During the next several days, Proctor and Coenen went on to commit three additional robberies.  They robbed a Circle K in Mississippi (Coenen was in the car for this one, and Proctor again brandished his gun), an Arkansas Dollar General (where Proctor again brandished his gun, and they stole a second car, also an Elantra), and a Circle K in Illinois (with Proctor again brandishing his gun).

3

Meanwhile, an investigation was ongoing and law enforcement was connecting the robberies. For example, the officer investigating the carjacking learned that a demand note Coenen used in the Cricket Wireless robbery was written on a piece of paper obtained from the red Elantra's glove compartment—and on the paper was the VIN number for the stolen car. At the FBI's request, the media published surveillance stills from recordings of the Cricket Wireless and Subway robberies, and a business owner who had done business with Proctor recognized him. The business owner had Proctor's address, so FBI agents obtained a search warrant for the residence. There, agents found mail containing Proctor's and Coenen's names, as well as Mississippi and Wisconsin license plates. The red Elantra was found in Arkansas, where the Dollar General robbery occurred, further connecting the puzzle pieces.

After the Illinois robbery, Proctor and Coenen made their way to Mississippi in the second stolen Elantra. When they encountered police there, Proctor sped through a parking lot to evade the police and crashed. Proctor fled, but Coenen was injured and immobilized. An unidentified man pulled Coenen from the car and carried her to a nearby field. She told the man to leave because the car was stolen, and he did. Police apprehended Coenen. She gave a description of Proctor, whom police eventually found and apprehended. Coenen implicated Proctor in the robberies and initially tried to minimize her role. She also told law enforcement

4

that Proctor made her participate in the crimes. Law enforcement collected physical evidence from the wrecked car, including two baseball caps, water bottles, and a nine-millimeter pistol; and tests determined that DNA on the evidence matched Proctor's.

At trial, the district court instructed the jury multiple times that Proctor was only on trial for the acts alleged in the indictment, and not the carjacking and other robberies. The court also asked the jurors whether they understood, and they collectively responded "Yes."

Not surprisingly, Coenen was a primary witness at trial. She testified that she met Proctor when she was 17 years old and that the two began a romantic relationship. She led the jury through the details of her and Proctor's crime spree and identified Proctor in surveillance footage of the robberies that was played for the jury. Of the carjacking, she testified that she "went along with it" because she was "[s]cared of" Proctor. Doc. 217 at 53.[1] She acknowledged having agreed to cooperate with the government, including by testifying against Proctor, because she was "hoping to get a sentence reduction," "[m]aybe half" of what she was facing, which was 60 years. *Id.* at 84–85.

On cross-examination, defense counsel confronted Coenen with her statements to law enforcement that she felt she was under duress and that Proctor

_____

[1] "Doc." numbers refer to the district court's docket entries.

made her commit crimes with him.  Counsel juxtaposed those statements with the facts that Coenen never sought help from police or witnesses during the crime spree and ultimately pled guilty to the conspiracy and robberies.  When defense counsel asked whether Coenen had ever said, "Stop the car, fool; this ride is over.  I'm done," Coenen said, "It's not that simple, no."  *Id.* at 179–80.  Defense counsel also confronted Coenen with an inconsistency between her testimony and surveillance footage regarding Proctor's clothing during one of the robberies.  Counsel asked whether Coenen's "memory [was] faulty," and she answered, "Maybe."  *Id.* at 143.

In addition to pointing out faults in her memory, defense counsel repeatedly asked Coenen to confirm that she was testifying against Proctor in the hopes of obtaining a more favorable sentence.  Counsel asked, "So you need [Proctor] to fight this so you can get your [credit for] cooperation because without him, there is no cooperation?  If he pled guilty, you're out of luck?"  *Id.* at 168.  Coenen responded, "Yeah."  *Id.*; *see id.* at 193–94 (Q: "So you've got to dance for them.  And the dance they want you to tell is that this all happened with him.  And if you don't do that dance, you don't get your deal, do you?"  A: "Yeah.").  Counsel asked, "This is about you trying to lower your sentence.  And in fairness, that's what's important to you, correct?," and Coenen responded, "Correct."  *Id.* at 217.  Counsel suggested that Coenen may be implicating Proctor even if he had not

committed the crimes and ended cross examination with: "So I ask you, why don't you tell this jury who you are protecting? Because that person won't have to do any sentence, and you get a lighter sentence, and everybody on your side wins." *Id.* at 218–19.

In response to the cross-examination of Coenen, the government argued that defense counsel had opened the door for the introduction of two types of evidence to rehabilitate Coenen's credibility. First, the government argued that it should be allowed to elicit testimony from Coenen that Proctor had physically and emotionally abused her. The court agreed that the door was "cracked open" and permitted the government to introduce limited testimony about "the power dynamic [between Proctor and Coenen] during the string of incidents." *Id.* at 222–24. The court reasoned that such information "answers the question in the jurors' mind, 'Why would someone even begin to go along with this in the first place if there was not some sort of abusive dynamic leading you to have a fear,'" noting that, "quite frankly, her credibility is very much at issue." *Id.* at 238. The court acknowledged that although Coenen had testified to her fear, "[t]hat fear has not been explored," so it was "baseless fear, in [the jurors'] minds." *Id.*

Over the defense's objection, Coenen testified that she was afraid during the crime spree because Proctor "was abusive a lot." *Id.* at 267. She testified that she attempted to leave when the pair was in Fort Lauderdale, but Proctor tried to hit

7

her with a car, shot at her, and told her to get in the car. She complied. She testified that, shortly before the crime spree began, Proctor attempted to strangle her with a WiFi cable. She added that he threatened to kill her if she left. She told the jury that even if she "tried to leave," Proctor "was faster and stronger," so he would be able to "catch [her] and beat [her] up." *Id.* at 269. The district court prohibited the government from exploring other alleged incidents of abuse, including that Proctor had trafficked Coenen and was her pimp. And the court prohibited Coenen from testifying that she had miscarried as a result of the strangling attempt.

Second, the government sought to introduce "under [Federal Rule of Evidence] 801(d)(1)(B) as a prior consistent statement" certain "select segments" from two recordings: one statement made to police in the field immediately upon her apprehension and one audio recording from her hospital interview with law enforcement. *Id.* at 244–45. In both, Coenen implicated Proctor in the robberies. The government argued that this evidence was admissible because defense counsel "ha[d] attacked her credibility on saying that she's lying now to get a deal." *Id.* at 245. The district court admitted the evidence over the defense's objection.

The jury returned a general verdict finding Proctor guilty on all counts. In anticipation of sentencing, the probation office prepared a presentence investigation report (PSR). As relevant to this appeal, the PSR stated that under

U.S.S.G. § 1B1.2(d), a conviction on a count charging conspiracy to commit more than one offense, a so-called "multi-object conspiracy," shall be treated as if the defendant had been convicted on a separate conspiracy count for each offense the defendant conspired to commit. The PSR calculated Proctor's offense level as though he had been convicted on a separate count of conspiracy to commit each of the six offenses (a carjacking and five robberies) in which he was implicated. By this calculation, each "conspiracy" was grouped separately; the carjacking conspiracy carried the highest base offense level (32) and therefore was used to determine Proctor's total offense level; Proctor's total offense level was 36 under the grouping rules in U.S.S.G. § 3D1.4. With a criminal history category of VI, Proctor's resulting advisory Sentencing Guidelines range was 324 to 405 months' imprisonment, the statutory maximum term of imprisonment for Counts 1, 2, and 4 was 20 years, and the statutory term of imprisonment for Counts 3 and 5 ranged from seven years to life.

Both Proctor and the government objected to the PSR's characterization of the conspiracy as having six object offenses. The government argued that the PSR wrongly treated the conspiracy as multi-object and that Proctor's uncharged offenses should be accounted for not by applying the grouping rules, but by treating the uncharged offense conduct as relevant conduct under U.S.S.G. § 1B1.3. Proctor argued in addition that the PSR mistakenly treated the conspiracy

as having six object offenses, at least without the district court finding beyond a reasonable doubt that he had committed the offenses not charged in Counts 2 and 4.

At sentencing, the district court treated the conspiracy as a single-object conspiracy to commit Hobbs Act robbery. As the government urged, the court treated the uncharged offense conduct as relevant conduct, finding that the facts had been established by a preponderance of the evidence.[2] The district court calculated a base offense level of 20 under U.S.S.G. § 2B3.1(a) and a total offense level of 33, which incorporated several enhancements based on relevant conduct. With a criminal history category of VI, this yielded a guidelines range of 235 to 293 months' imprisonment as to Counts 1, 2, and 4, with additional consecutive terms of 84 months' imprisonment for each of Counts 3 and 5. The court imposed a sentence of 240 months' imprisonment as to Counts 1 and 2 to be served concurrently; 53 months as to Count 4 to be served consecutively; and 84 months as to each of Counts 3 and 5, to be served consecutively to each other and to Counts 1, 2, and 4—for a total term of 461 months' imprisonment.

---

[2] *See United States v. Siegelman*, 786 F.3d 1322, 1332 (11th Cir. 2015) ("Because the limits of sentencing accountability are not coextensive with the scope of criminal liability, relevant conduct is broadly defined to include both uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence." (citation and internal quotation marks omitted)).

The district court noted Proctor's objections, including to the application of certain enhancements as relevant conduct based on a finding of facts by a mere preponderance of the evidence.  The court stated that even if it "miscalculated something" in determining Proctor's guidelines range, it would have ordered the same sentence because it would have "us[ed] every single factor to vary upward to reach the sentence of 461 months."  Doc. 221 at 83–84.  The district court found that the sentence was "commensurate with the offense," including the "terror" inflicted upon the robbery victims, and Proctor's "individual characteristics," including his lengthy criminal history.  *Id.*  The court concluded, "under [18 U.S.C. §] 3553(a), the circumstances of the offense mandate a sentence of 461 months." *Id.* at 85.

This is Proctor's appeal.

## II.

"We review a district court's evidentiary rulings for a clear abuse of discretion and will reverse those rulings only if the resulting error affected the defendant's substantial rights."  *United States v. Flanders*, 752 F.3d 1317, 1334 (11th Cir. 2014) (internal quotation marks omitted).

We review the district court's application of the Sentencing Guidelines *de novo*.  *United States v. Newman*, 614 F.3d 1232, 1235 (11th Cir. 2010).  An error in the district court's calculation of a defendant's guidelines range is reversible

absent harmless error. *United States v. Scott*, 441 F.3d 1322, 1329–30 (11th Cir. 2006). An error in calculating a defendant's guidelines range is harmless if the district court stated on the record that it would impose the same sentence even if it decided guidelines calculations issues in the defendant's favor and, assuming the lower range applied, the final sentence was reasonable taking into account the factors set forth in 18 U.S.C. § 3553(a).[3] *See United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006).

### III.

Proctor has challenged both his convictions and his sentence. As to his convictions, he argues that the district court erred in several important evidentiary rulings. As to his sentence, he initially challenged the district court's characterization of the conspiracy as having a single object; now, he concedes that any such error was harmless. We first address the evidentiary issues and second explain why Proctor is correct that any error in his guidelines calculation was harmless.

### A. Evidentiary Issues

Proctor argues that the district court abused its discretion in permitting the government to introduce under Federal Rule of Evidence 801(d)(1)(B) recordings of Coenen implicating him in the robberies and to question Coenen about Proctor's

---

[3] *See infra* Part III.B.

physical and emotional abuse shortly before and during the crime spree. And, he

argues, the district court erred in permitting the government to elicit testimony

about the other, uncharged offenses in the spree. We discern no abuse of

discretion.

First, the recordings. Rule 801(d)(1)(B) provides:

> A statement that meets the following conditions is not hearsay: The
> declarant testifies and is subject to cross-examination about a prior
> statement, and the statement . . . is consistent with the declarant's
> testimony and is offered: (i) to rebut an express or implied charge that
> the declarant recently fabricated it or acted from a recent improper
> influence or motive in so testifying; or (ii) to rehabilitate the declarant's
> credibility as a witness when attacked on another ground.

Fed. R. Evid. 801(d)(1)(B). Proctor contends that he "neither expressly nor

impliedly suggested that Coenen developed a motive to lie after signing the [plea]

agreement." Appellant Br. at 16. Instead, he argues, he "challenged Coenen's

initial statements made to law enforcement upon her arrest, which were lies

designed to make her look like a victim." *Id.* In his telling, "Coenen's motive to

lie was her arrest," so statements made during and after her arrest arose "*after*

Coenen's motive to fabricate arose." *Id.* We do not agree.[4]

---

[4] Proctor also argues, for the first time on appeal, that the government's "use of these
recordings for more than rehabilitating Coenen's alleged recent fabrication, during its closing
argument, was improper." Appellant Br. at 28. He argues that the government used the
recordings for the truth of the matter asserted, both in violation of Rule 801(d)(1)(B) and the
district court's limiting instruction, which provided that the recordings were "not for the truth of
what is being said," but only "regarding witness credibility," Doc. 217 at 273. Rule 801(d)(1)(B)
is not as limited as the district court's instruction—evidence admissible under the rule is "not

13

Even though Proctor suggested that Coenen was lying about the magnitude of her involvement in the offense and about the duress she felt she was under, he also suggested that she had a motive to lie in the hopes of receiving a reduced sentence. Proctor's counsel suggested that the government wanted Coenen to "dance"—to say "that this all happened with" Proctor—and that if she didn't "do that dance," she would not get her deal. Doc. 217 at 193. Counsel asked, and Coenen agreed, that her testimony was "about . . . trying to lower [her] sentence." *Id.* at 217. And when asking Coenen "who [she was] protecting," counsel suggested that by lying about Proctor's role in the crimes Coenen hoped to ensure that the real culprit "won't have to do any sentence" and Coenen would "get a lighter sentence." *Id.* at 218–19. Plus, the excerpts of the recordings the district court admitted under Rule 801(d)(1)(B) depicted Coenen implicating Proctor, not minimizing her role or saying that Proctor made her commit crimes. Thus, Proctor expressly suggested that Coenen's plea deal gave her a motive to lie, and the evidence the district court admitted was tailored to rebut that charge. *See* Fed. R. Evid. 801(d)(1)(B)(i).[5]

---

hearsay" and therefore admissible for its truth. *See* Fed. R. Evid. 801(d). Even so, the record makes clear that the government replayed the recordings during closing argument only to reiterate its position that Coenen was a credible witness. Thus, Proctor has failed to demonstrate reversible error.

[5] Even if the evidence were inadmissible under subsection (i) of the rule, it would have been admissible to rehabilitate Coenen's credibility under subsection (ii). As Proctor acknowledges, he attempted to undermine Coenen's credibility by pointing to her inconsistent

Second, testimony about abuse.  Proctor argues that the district court erred in permitting Coenen to testify about Proctor's physical and emotional abuse that occurred just before and during the crime spree.  He contends that he never opened the door to such evidence, and that, even if he had, the evidence was unduly prejudicial and therefore inadmissible under Federal Rule of Evidence 403.  This is not so.  The district court correctly concluded that defense counsel had "cracked open" the door for evidence of Proctor and Coenen's power dynamic by implying that Coenen was as active and willing a participant in the spree as Proctor and never told him she was "done" committing crimes with him.  Doc. 217 at 179, 224.

And the court carefully limited the scope of evidence admitted in response to defense counsel's implications.  Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Proctor argues that the evidence of abuse was admitted "to show the jury that Proctor was violent and dangerous and to invite them to infer his guilt from those extrinsic acts alone." Appellant Br. at 40–41.  There is no doubt that evidence Proctor had physically and emotionally abused Coenen carried with it a potential for prejudice.  But the

---

claims of duress and responsibility, her generally faulty memory, and the downplaying of her role in the offenses.  These attacks opened the door for the government to rehabilitate Coenen's "credibility as a witness."  Fed. R. Evid. 801(d)(1)(B)(ii).

district court was within its discretion to determine that any prejudice would not be unfair and therefore render the evidence inadmissible. The evidence was highly probative of why Coenen stayed by Proctor's side during the spree and why she feared him, two questions defense counsel's cross-examination raised but Coenen had not had an opportunity to answer. We see no reason to disturb the district court's balancing of these factors given the considerable leeway we afford the district court on appeal.

Third, the admission of uncharged offenses. Over Proctor's objection, the district court admitted evidence of uncharged offenses because they were inextricably intertwined with the charged offenses and, alternatively, admissible under Rule 404(b).[6] Because we agree that the evidence was inextricably intertwined with the charged offenses, we need not analyze admissibility under Rule 404(b).

"Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted" as intrinsic to a charged offense "if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *United*

---

[6] "Evidence of any other crime, wrong, or act . . . may be admissible" for purposes other than character evidence, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

*States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (internal quotation marks omitted); *see United States v. Baker*, 432 F.3d 1189, 1205 n.9 (11th Cir. 2005) ("[I]n this Circuit evidence of other crimes, wrongs, or acts falls outside the scope of Rule 404(b) when it is: (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." (internal quotation marks omitted)), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006). "While not all bad acts occurring within the time frame of the conspiracy are automatically admissible," the fact that uncharged acts "occurred with a witness co-conspirator during the time of the conspiracy weighs heavily towards finding the acts are intertwined." *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985). Even if evidence is admissible as intrinsic to charged offenses, it must not run afoul of Rule 403. *Baker*, 432 F.3d at 1205 n.9.

The carjacking that occurred before the Cricket Wireless robbery and the three robberies that occurred after the Subway robbery were admissible as inextricably intertwined with the charged offenses because they arose out of the same series of transactions as the charged robberies. Coenen, as Proctor's co-conspirator, was involved in all of these acts, a fact that weighs heavily in favor of the court's finding that they were intertwined. *Williford*, 764 F.2d at 1499. The

17

offenses, charged and uncharged, occurred during a relatively short time frame: six in two weeks, or nearly one every two days. The uncharged acts also were necessary to complete the story of the charged offenses for the jury because the acts showed how law enforcement pieced together the evidence that led them, ultimately, to Proctor and Coenen. For these reasons, the evidence was intrinsic to the charged offenses.

The evidence also satisfied Rule 403. For the reasons just articulated, the evidence was highly probative. Although the evidence had the potential to prejudice Proctor, the district court repeatedly gave the jury a limiting instruction, which we presume it followed. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions . . ."). Proctor has not convinced us that the probative value of the evidence was "substantially outweighed by" the danger of unfair prejudice, Fed. R. Evid. 403, and so we uphold the district court's admission of this evidence.

For all of these reasons, we affirm Proctor's convictions.

## B. Sentencing Issue

Proctor raised a final challenge in his brief on appeal. He argued that the district court erred in classifying his conspiracy as having a single object. The government responded that any error in the conspiracy's classification was harmless because the district court stated on the record that it would have imposed

18

a sentence of 461 months' imprisonment regardless of any error, a sentence that was reasonable based on the sentencing factors set forth in 18 U.S.C. § 3553(a). At oral argument, Proctor conceded that any error was harmless. Because we agree, we need not address whether any error occurred.

If a district court announces on the record that it would impose the same sentence regardless of its ruling on a contested guidelines issue, we will find any error harmless and affirm the sentence the court imposes provided that sentence is reasonable. *Keene*, 470 F.3d at 1348–49. Here, the district court made such an announcement. Our task, then is to determine whether the court's sentence was reasonable. For that inquiry we "assum[e] exactly the same conduct and other factors in the case, but us[e] an advisory range" that would have applied had the district court decided the contested issue in the defendant's favor. *Id.* at 1349–50.

We review the substantive reasonableness of a sentence under a deferential abuse-of-discretion standard, *United States v. Irey*, 612 F.3d 1160, 1186 (11th Cir. 2010) (en banc), and examine the sentence's reasonableness under the totality of the circumstances, *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009). The district court is required to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" listed in § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the

defendant's future criminal conduct.  18 U.S.C. § 3553(a)(2).  In imposing a

particular sentence, the court must also consider the nature and circumstances of

the offense, the history and characteristics of the defendant, the kinds of sentences

available, the applicable guidelines range, the pertinent policy statements of the

Sentencing Commission, the need to avoid unwarranted sentencing disparities, and

the need to provide restitution to victims.  *Id.* § 3553(a)(1), (3)–(7).  A sentencing

court may consider both uncharged and acquitted conduct in determining the

appropriate sentence.  *United States v. Smith*, 741 F.3d 1211, 1227 (11th Cir.

2013).

If a district court imposes a sentence outside of the applicable advisory

guidelines range, we must consider the extent of the deviation and "ensure that the

justification is sufficiently compelling to support the degree of the variance."  *Gall

v. United States*, 552 U.S. 38, 50 (2007).  Even when considering the extent of a

variance, we must give due deference to the district court's decision that the

§ 3553(a) factors, on the whole, justify it.  *Id.* at 51.  We will remand only when

"left with the definite and firm conviction that the district court committed a clear

error of judgment in weighing the § 3553(a) factors by arriving at a sentence that

lies outside the range of reasonable sentences dictated by the facts of the

case."  *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008) (internal

quotation marks omitted).  A sentence imposed well below the statutory maximum

20

is an indicator of a reasonable sentence. *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).

Even if the district court had used Proctor's preferred guidelines range as the lodestar for sentencing, the resulting sentence of 461 months' imprisonment—a significant upward variance—would have been within the district court's considerable discretion to impose. Proctor advocated for a base offense level of 20 and a total offense level of 23. With a criminal history category of VI, this offense level would have resulted in a guidelines range of 92–115 months' imprisonment, plus two 84-month consecutive terms for the § 924(c) convictions in Counts 3 and 5. A 461-month sentence represents a 178-month upward variance—a very substantial variance. The court's justifications for such an upward deviation were, however, sound. Proctor had committed numerous uncharged offenses, all of which involved a firearm and put victims in fear of their lives. *See Smith*, 741 F.3d at 1227. Proctor also had a lengthy criminal history, a factor the court was entitled to take into account. *See* 18 U.S.C. § 3553(a)(1). And even with a 178-month upward variance, the sentence the court imposed was well within the statutory maximum, which would have been 240 months' imprisonment for each of Counts 1, 2, and 4, and life for Counts 3 and 5. *See Gonzalez*, 550 F.3d at 1324.

For all of these reasons, we agree with both Proctor and the government that the sentence the district court imposed was reasonable, so any error in the guidelines calculation was harmless.  We affirm Proctor's sentence.

IV.

For the foregoing reasons, we affirm Proctor's convictions and sentence.

**AFFIRMED.**